Ronald J. RATKOSKY; Paul B. Brossard; Cloyd G. Case; Ray W. Coontz; J. Di-Puccio; James D. Fogarty; Charles H. Girts; Robert Hanus; William C. Hansen; Rolf J. Haltrich; John H. Harrington; Thomas A. Kawecki; et al., Plaintiffs–Appellants,

v.

UNITED TRANSPORTATION UNION; Consolidated Rail Corporation, Defendants–Appellees.

No. 87–3175.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 26, 1988.

Decided and Filed March 24, 1988.

Wallace R. Steffen (argued), Cleveland, Ohio, for plaintiffs-appellants.

Norton N. Newborn (argued), Norton N. Newborn Co., L.P.A., Helen Kryshtalowych, Squire, Sanders & Dempsey, Cleve-

land, Ohio, Ronald J. James, Jeffrey H. Burton (argued), Consol. Rail Corp., Philadelphia, Pa., for defendants-appellees.

Before: MILBURN and GUY, Circuit Judges, and CONTIE, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

Plaintiffs, fifty railroad workers, filed suit against the United Transportation Union (UTU or the Union) and the Consolidated Rail Corporation (Conrail) seeking damages and a change in their seniority rights. Specifically, plaintiffs brought a claim for "equitable reformation" of the collective bargaining agreement. Plaintiffs also alleged that the UTU breached its duty of fair representation to its members. Finally, plaintiffs alleged that Conrail conspired with UTU to deprive plaintiffs of their employment rights. The district court granted defendants' motion for summary judgment, ruling that plaintiffs' contract claims for reformation of the bargaining agreement were preempted by federal labor laws. The district court also ruled that plaintiffs' claim against the UTU was time-barred, and even if it was not, that the plaintiffs had failed to show that the Union had breached its duty of fair representation. Accordingly, the district court also dismissed the conspiracy claim against Conrail. We agree and affirm.

## I.

In 1973, Congress passed the Regional Rail Reorganization Act, as amended, 45 U.S.C. §§ 701–797 ("3R Act"). This Act authorized the formation of Conrail through the acquisition and consolidation of eight financially troubled railroads including the Erie Lackawana and the Penn Central. Under the 3R Act, Conrail was required to offer employment to the employees of the bankrupt railroads. 45 U.S.C. § 772(b) (1976) (repealed 1981). Moreover, in the event that a railroad worker

with more than five years experience lost his job as a result of the merger, then he was entitled to collect monthly cash payments in the form of monthly "displacement allowances" until he reached the age of 65. 45 U.S.C. § 775(b) ("Title V") (repealed 1981).[1]

In addition to the job protection provisions, the 3R Act also provided that Conrail would assume existing collective bargaining agreements with the various trade unions representing railway workers and undertake the negotiation of new agreements. 45 U.S.C. § 772(b) (1976) (repealed 1981). The 3R Act provided that any agreement between Conrail and organized labor unions would ensure that the employees of the bankrupt railroads "who have seniority on the lines, properties or facilities acquired by [Conrail] ... shall have prior seniority roster rights on such acquired lines, properties, or facilities." *Id.* § 774(a) (repealed 1981). The Act further mandated that Conrail and the labor unions were to negotiate "the procedure for determining the seniority of such employees in their respective crafts or classes on [Conrail's] system which shall, to the extent possible, preserve their prior seniority rights." *Id.* § 774(b)(4) (repealed 1981).

Pursuant to this Congressional mandate, UTU and Conrail negotiated a bargaining agreement in 1975 establishing seniority rights according to a complicated two-tiered system. First, all Conrail employees were merged into a "dove-tailed" seniority roster according to the date each employee was hired by the original railroad. Second, each employee was given a prior right to positions in the operating area of the employee's former railroad. For example, if a position opened up in an area formerly operated by Penn Central, then a worker with ten years seniority with Erie Lackawana would have priority over another applicant who had five years seniority with Reading Railroad; but, a former Penn Central worker would have priority over both

---

1. This employee protection program eventually proved to be too costly. Therefore, Title V was repealed by act of Congress on August 13, 1981, effective September 1, 1981, pursuant to the Northeast Rail Service Act of 1981, Title XI,

§ 1144(a)(1), 95 Stat. 669. Title V was replaced by Title VII, 45 U.S.C. § 797 (1982), which provided for more modest benefits with a lifetime limit of $20,000 for each displaced worker. 45 U.S.C. § 797(d) (1982).

the other applicants regardless of their relative seniority. The collective bargaining agreement which established this seniority system went into effect on April 1, 1976, when Conrail officially commenced operations.

Plaintiffs are all former employees of Erie Lackawana. After the merger, Conrail shut down many of the old Erie Lackawana facilities but continued to operate much of the Penn Central system. As a result, many former Penn Central "trainmen" exercised their "prior rights" and were able to continue to work, whereas many former Erie Lackawana employees were laid off, despite their relatively greater seniority. Apparently, some of these laid-off workers complained to the UTU about the seniority system, but most were willing to accept the lay-offs since they continued to receive full benefits under the Title V protection plan. These benefits were curtailed, however, in 1981 when Congress repealed Title V. According to plaintiffs, they renewed their complaints to the UTU; nevertheless, the Union refused to renegotiate the seniority system established under the collective bargaining agreement with Conrail.

On July 25, 1984, plaintiffs filed this suit in federal court against UTU and Conrail. In Count I of the complaint, plaintiffs claimed that they were entitled to equitable reformation of the seniority provisions of the collective bargaining agreement. Specifically, plaintiffs argued that the two-tiered seniority system was contrary to the statutory mandate contained in the former 45 U.S.C. § 774(b) (repealed 1981) which provided that "the procedure for determining the seniority of such employees … shall, to the extent possible, preserve their prior seniority rights." Plaintiffs also argued that the contract should be rewritten by the court based on common law contract theories of "mutual mistake of fact" and "lack of consideration." According to plaintiffs, the seniority system was negotiated under the assumption that the Title V protections would continue indefinitely. Thus, plaintiffs contended that the subsequent repeal of these provisions amounted to a "mutual mistake of fact" or a "lack of consideration."

In Count II of plaintiffs' complaint, they alleged that the UTU breached its duty of fair representation by refusing to renegotiate the two-tiered seniority system after Congress repealed the Title V income protection provisions in 1981. Finally, in Count III, entitled "Conspiracy," plaintiffs alleged that Conrail was liable for "collaborating" with UTU by failing to prevent UTU's alleged breach of its duty of fair representation.

In granting defendants' motions for summary judgment, the district court relied heavily on its previous opinion in a similar case involving nearly identical claims brought against Conrail and two other unions. *See Loew v. Consolidated Rail Corp.*, No. 84–2976 (N.D. Ohio, Oct. 31, 1985) [available on WESTLAW, 1985 WL 5963], *aff'd*, 812 F.2d 1407 (6th Cir.1987). With respect to plaintiffs' claim for reformation of the collective bargaining agreement, the district court ruled that the common law claims were preempted by federal law and that a claim for breach of the duty of fair representation is the exclusive remedy available to a union member who seeks to challenge the terms of a collective bargaining agreement. Again relying on *Loew*, the district court ruled that the plaintiffs' claims in Count II alleging that UTU had breached its duty of fair representation were barred by the applicable six-month statute of limitations. The district court found that plaintiffs should have known no later than May 25, 1982, that the UTU would not renegotiate the seniority issue, since the local union had received a letter to that effect from the UTU on that date. Thus, the district court concluded that plaintiffs' claims for breach of the duty of fair representation based on the UTU's failure to renegotiate were untimely.

In the alternative, the district court found that, based on the undisputed evidence presented for summary judgment, plaintiffs had failed to show that UTU's refusal to renegotiate the contract was arbitrary or in bad faith. Thus, assuming

*arguendo*, that plaintiffs' claims against the Union were not untimely, the district court ruled that the Union was entitled to summary judgment on the merits. The district court summarily disposed of plaintiffs' "conspiracy" claim against Conrail finding that such a claim was necessarily dependent upon the plaintiffs prevailing in their claims against the Union.

## II.

■ Plaintiffs concede that the claim for reformation of the collective bargaining agreement is not an independent cause of action but, rather, is more in the nature of a request for a particular type of relief based upon a showing that UTU has breached its duty of fair representation.[2] Plaintiffs' arguments in favor of reformation of the contract based on state common law theories of mutual mistake and failure of consideration are clearly preempted by federal law. *See generally Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 208–10, 105 S.Ct. 1904, 1909–11, 85 L.Ed.2d 206 (1985). Accordingly, we now consider the central question raised on appeal, i.e., did the district court err in granting summary judgment in favor of defendants on the plaintiffs' claim that the Union breached its duty of fair representation by refusing to renegotiate the seniority provisions of the collective bargaining agreement.

## III.

The district court correctly stated the standard for granting summary judgment under Fed.R.Civ.P. 56(c) which provides in part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

2. In their brief on appeal, plaintiffs state: "First, it should be noted that in order for the Court to have equity jurisdiction for the reformation of the Seniority Agreement, it must first be shown

As previously noted, the district court found that when the undisputed facts were viewed in the light most favorable to plaintiffs, defendants were entitled to summary judgment on the claim for breach of duty of fair representation both because the suit was untimely and because the claim was without merit. We address these two issues *seriatim.*

### A. Statute of Limitations

■ In *Del Costello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the Supreme Court established a six-month period of limitations for claims alleging breach of duty of fair representation brought pursuant to section 301 of the Labor Management Relations Act (LMRA). This same limitations period applies to similar actions brought under the Railway Labor Act. *West v. Conrail*, — U.S. —, 107 S.Ct. 1538, 95 L.Ed.2d 32 (1987). The dispositive issue presented below and on appeal is at what point did the plaintiffs' cause of action accrue. As a general rule, the limitations period begins to run when the potential plaintiff "knows or should have known of the union's alleged breach of its duty of fair representation." *Dowty v. Pioneer Rural Electric Co–Op., Inc.*, 770 F.2d 52, 56 (6th Cir.), *cert. denied*, 474 U.S. 1021, 106 S.Ct. 572, 88 L.Ed.2d 557 (1985).

■ First, plaintiffs are essentially complaining about the effects of a seniority system which went into effect on April 1, 1976. Therefore, any claim for breach of the duty of fair representation in connection with the negotiation of the seniority system should have been brought within six months of that date. Under plaintiffs' theory of the case, a separate breach of duty occurred when the UTU failed to take steps to *renegotiate* the seniority provisions following the repeal of the Title V income protections. Even under this theory, however, plaintiffs' action would still be time-barred. The statute which repealed

that there was unfair representation." Elsewhere in their brief, however, plaintiffs seem to suggest that "equitable reformation" remains as a separate cause of action.

the Title V protections went into effect September 1, 1981. *See* Pub.L. 97–35, Title XI, § 1144(a), 95 Stat. 669. In response to a request from the local membership, a letter was sent from UTU to the local union on May 25, 1982, informing the local that UTU would not renegotiate the seniority provisions. Thus, the plaintiffs knew or should have known at that time that UTU was unwilling to renegotiate the contract. If this refusal to renegotiate is the basis of the complaint, then plaintiffs should have filed their action within six months of May 25, 1982.

■ Plaintiffs have attempted to circumvent the limitations barrier by arguing that the UTU was prohibited by law from renegotiating the seniority issue until April 1, 1984. In support of this argument, plaintiffs cite to section 708 of the Northeast Rail Service Act (NRSA), 45 U.S.C. § 797g,

which prohibited the negotiation of "job stabilization or other protective agreements" prior to April 1, 1984.[3] Thus, plaintiffs conclude that their cause of action based on the UTU's failure to renegotiate could not have arisen until after the expiration of the statutory moratorium. Assuming, *arguendo*, that plaintiffs raised this argument below, thereby preserving the issue for appeal, we find the argument without merit.[4]

The phrase "job stabilization or other protective agreements" was not specifically defined in the NRSA; however, the context and the legislative history clearly indicate that the statute was intended to prevent the unions from using the collective bargaining process to regain the type of income protection programs such as those contained in the former Title V.[5] Section

**3.** Section 708 of the National Rail Service Act provides in part:

(a) Agreement

Not later than 60 days after the effective date of any conveyance pursuant to the provisions of this chapter, the representatives of the various classes or crafts of employees of a railroad in reorganization involved in a conveyance and representatives of the Corporation shall commence negotiation of a new single collective bargaining agreement for each class and craft of employees covering the rate of pay, rules, and working conditions of employees who are the employees of the Corporation. *Such collective bargaining agreement shall include appropriate provisions concerning rates of pay, rules and working conditions, but shall not, before April 1, 1984, include any provisions for job stabilzation which may exceed or conflict with those established herein.* Negotiations with respect to such single collective bargaining agreement, and any successor thereto, shall be conducted system-wide.

. . . .

(c) Railway labor act notices

Employees of the Corporation *may not serve notices under section 156 of this title for the purpose of negotiating job stabilization or other protective agreements with the Corporation until after April 1, 1984.*

45 U.S.C. § 797g (1987) (emphasis added).

**4.** In response to defendants' argument that plaintiffs failed to raise this argument before the district court, plaintiffs quote from a portion of the transcript of the oral argument on the summary judgment motion wherein counsel for plaintiffs stated:

With respect to the statute of limitations, I should also mention this, that I believe it's

under Section 807 of the Northeast Rail Service Act that provides for a moratorium on collective bargaining until, it was 1984, I forget the date. In 1984 the moratorium—well, it was in the Spring of 1984. All right, it's in the record, the exact date, your Honor.

In fact, the statutory moratorium to which plaintiffs' counsel refers was contained in section *708* of the NRSA codified at 45 U.S.C. § 797g (1987). It is highly questionable as to whether this passing reference to an incorrect (and apparently non-existent) statutory provision was sufficient to properly present this somewhat complicated argument to the district court.

**5.** The Joint House and Senate Conference Report on the NRSA explained that it was to supplant all other provisions on employee protection:

Section 301 amends the 3R Act by adding a new Title VII. Section 701 establishes a program for protecting Conrail employees previously protected under Title V of the 3R Act, while limiting the cost to the federal government. Conrail Title V labor protection is repealed and their protection provided is less than the normal protection in the railroad industry. It is less only because of the dire financial circumstances of the Corporation.

\*     \*     \*     \*     \*     \*

The benefits under this section are intended to replace the benefits provided under Title V of the 3R Act. This is the exclusive protection for employees, and any employee protection contained in collective bargaining agreements is replaced by this protection.

H.R.Conf.Rep. No. 97–208, 97th Cong., 1st Sess., U.S.Code Cong. & Admin.News 1981, p. 396,

708 of NRSA made it clear that the only employee protections allowed, at least until April 1, 1984, were those provided in the new Title VII which supplanted the former Title V. There is nothing in the language of the NRSA or in the legislative history which would indicate that the "moratorium" extended to the negotiation of *seniority* rights. Moreover, there is nothing in the record showing that either UTU or Conrail had adopted this strained interpretation of the statute or that they had considered themselves barred from negotiating the issue of seniority rights. Rather, the record shows that the UTU repeatedly refused to renegotiate the seniority system because it had determined that the plaintiffs' proposed plan was not in the best interest of the majority of the membership. Accordingly, we reject plaintiffs' argument that their cause of action did not accrue until after the expiration of the statutory moratorium contained in section 708.

In their reply brief, plaintiffs raise yet another argument relating to the limitations issue. Plaintiffs cite to evidence in the record which shows that on May 29, 1984, Conrail made a formal proposal to abolish the two-tiered seniority system and replace it with a straight dove-tail roster similar to that advocated by the plaintiffs.[6] According to the plaintiffs, they could not be sure that the UTU would refuse to renegotiate the seniority issue until the UTU rejected the formal Conrail proposal to change the seniority system. Thus, they argue that their cause of action accrued on May 29, 1984.

The record is replete with undisputed evidence (including the May 25, 1982, letter to the local) indicating that the UTU would not renegotiate the seniority provisions, despite the elimination of the statutory income protection plan embodied in Title V. Thus, we find that the plaintiffs should have known that the UTU would not renegotiate their seniority rights long before the UTU rejected Conrail's formal proposal.[7] *See Engelhardt v. Consolidated Rail Corp.*, 756 F.2d 1368, 1369–70 (2d Cir. 1985).[8]

For the foregoing reasons, we find the district court correctly concluded that the plaintiffs' suit was barred by the applicable six-month period of limitations.

## B. Duty of Fair Representation

■ Assuming, *arguendo*, that plaintiffs' claims are not time-barred, then we find that the district court was correct in granting summary judgment in favor of defendants on the merits.

Essentially, plaintiffs claim that the UTU breached its duty of fair representation by refusing to renegotiate the two-tiered se-

*reprinted in* 127 Cong.Rec.S. 9060 (daily ed. July 31, 1981).

6. Once again, it appears that plaintiffs did not properly present this argument to the district court below. We need not rule on that issue, however, because we find plaintiffs' substantive argument without merit.

7. We note that plaintiffs' argument on the statute of limitations issue is totally inconsistent with their claim that Conrail "conspired" with UTU to deprive plaintiffs of their employment rights. In an attempt to save their claim from being barred as untimely, plaintiffs argue that their cause of action accrued when the UTU rejected Conrail's proposal to change the seniority system. Conrail's proposal was essentially identical to the seniority system which the plaintiffs advocated before the district court. Thus, it is difficult to understand how Conrail's action could be construed as being part of a "conspiracy" to deprive plaintiffs of their "employment rights."

8. In *Engelhardt*, the Second Circuit Court of Appeals upheld the district court's dismissal of a suit brought by Conrail employees challenging the post-merger seniority system. The Second Circuit held that the plaintiffs' duty of fair representation claim was barred by the six-month limitations period established in *Del Costello*. In so ruling, the court stated:

Whether their cause of action is held to have accrued in 1968–69, when the agreements giving rise to the seniority system were signed; or 1970, by which time the appellants admit they were aware of their lowered seniority; or even 1982, at which time they were allegedly affected by their seniority under the scheme, the complaint filed on August 10, 1983 was untimely. We agree with the district court's holding that the union's activity (or lack thereof) since the agreements were entered into does not constitute a continuing violation, thus tolling the six-month statute of limitations.

*Engelhardt*, 756 F.2d at 1370.

niority system in light of the 1981 repeal of the Title V income protection provisions. It is well established that a claim of unfair representation requires a showing of bad faith, discrimination, or arbitrary conduct on the part of the Union. *See Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed. 2d 842 (1967). Plaintiffs claim that UTU's refusal to renegotiate demonstrates bad faith or arbitrary conduct in two ways. First, plaintiffs allege that the two-tiered seniority system violated section 504(b) of the 3R Act, 45 U.S.C. § 774(b) (repealed 1981) and, therefore, the UTU breached its duty by failing to revise the seniority system in accordance with the statute. Second, plaintiffs claimed that the two-tiered seniority system was unfair to former Erie Lackawana workers such as themselves and that the UTU had discriminated against them in favor of former Penn Central workers who made up a majority of the union membership. We find these claims are without merit.

### 1. Alleged Violation of Section 504(b)

Section 504(b) of the 3R Act provided in pertinent part:

> On or before the date of adoption of the final system plan by the Board of Directors of the Association as provided in section 207c of this Act, the representatives of the various classes or crafts of the employees of a railroad in reorganization involved in conveyance pursuant to this Act and representatives of the Corporation (ConRail) shall commence negotiation of a single implementing agreement for each class and craft of employees affected providing ... (4) the procedure for determining the seniority of such employees in their respective crafts or classes on the Corporation's system which shall to the extent possible, *preserve their prior seniority rights*
>
> ....

45 U.S.C. § 774(b) (repealed 1981) (emphasis added).

We find that the two-tiered seniority system negotiated between UTU and Conrail which allows workers to exercise their "prior rights" to bid on positions which become available within their former company is not inconsistent with the language of the statute set forth above. Moreover, section 504(b) was repealed in 1981. Under plaintiffs' theory of the case, the UTU's duty to renegotiate the seniority system did not arise until after the repeal of the Title V protections which occurred at the same time section 504(b) was repealed. Therefore, plaintiffs' argument that UTU breached its duty of fair representation by failing to revise the seniority system in accordance with their interpretation of section 504(b) is illogical since section 504(b) was repealed before this alleged duty arose.

### 2. Alleged Discrimination Against Minority Faction

Unions are given broad discretion by the courts in their collective bargaining decisions. In establishing seniority systems, there are a variety of legitimate options, and the courts are careful not to substitute their judgments for those of the authorized labor organization. Moreover, the fact that a seniority system in a collective bargaining agreement favors one group more than another does not in itself constitute a breach of the union's duty. Bad faith or intentional discrimination by the union must be shown. Thus, the Supreme Court has recognized:

> Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.
>
> Compromises on a temporary basis, with a view to long-range advantages, are natural incidents of negotiation. Differences in wages, hours and conditions of employment reflect countless variables. Seniority rules governing pro-

motions, transfers, layoffs and similar matters may, in the first instance, revolve around length of competent service. Variations acceptable in the discretion of bargaining representatives, however, may well include differences based upon such matters as the unit within which seniority is to be computed, the privileges to which it shall relate, the nature of the work, the time at which it is done, the fitness, ability or age of the employees, their family responsibilities, injuries received in course of service, and time or labor devoted to related public service, whether civil or military, voluntary or involuntary.

*Ford Motor Co. v. Huffman,* 345 U.S. 330, 338–39, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953) (quoted in *Shamblin v. General Motors Corp.,* 743 F.2d 436, 438 (6th Cir. 1984)).

Relying on the foregoing language from *Huffman,* the Ninth Circuit has stated:

An essential element, then, necessary to raise a limitation upon a union's discretion in bargaining with respect to seniority rights is a bad faith motive, an intent to hostilely discriminate against a portion of the union's membership.

*Hardcastle v. Western Greyhound Lines,* 303 F.2d 182, 185 (9th Cir.), *cert. denied,* 371 U.S. 920, 83 S.Ct. 288, 9 L.Ed.2d 229 (1962). In *Hardcastle,* the Ninth Circuit upheld the dismissal of the plaintiffs' suit challenging the imposition of a new seniority roster system following the merger of two bus companies. In holding that the plaintiffs had failed to state a claim against the union for breach of the duty of fair representation, the Ninth Circuit stated:

The appellants herein have done nothing more than present facts showing dissatisfaction with a result adopted by a majority of the union of which the appellants are members. That portions of an electorate will be dissatisfied with the result of an election is a fact inherent in the democratic process and the principle of majority rule.

*Hardcastle,* 303 F.2d at 187.

This court has also relied on the Supreme Court's decision in *Huffman* to uphold the dismissal of a suit filed by workers against their union. *See Shamblin v. General Motors Corp.,* 743 F.2d 436 (6th Cir.1984). In *Shamblin,* the union negotiated improved seniority rights for workers who had completed the eight years of training necessary to achieve certification as skilled trades journeymen. The new agreement was to be applied *prospectively,* and the plaintiffs who were then currently in the training programs argued that they were entitled to increased seniority rights based on the years that they had already served in the training programs. Relying on the passage from *Huffman,* quoted *supra,* this court held that the union did not breach its duty of fair representation with respect to those workers who were unable to take advantage of the improved seniority provisions. *Shamblin,* 743 F.2d at 438–39.

The principles set forth by the Ninth Circuit in *Hardcastle* and by this court in *Shamblin* have also been applied in the context of worker challenges to the union's negotiation of seniority agreements under the Railway Labor Act. *See Augspurger v. Brotherhood of Locomotive Engineers,* 510 F.2d 853, 859 (8th Cir.1975). In *Augspurger,* a local union and seventeen individual members filed suit against the international union alleging a breach of the duty of fair representation based on the union's negotiation of a consolidated seniority roster following the pre-Conrail merger of several railway carriers. The plaintiffs alleged that their seniority rights had been diminished because the union had adopted a "work-equity" seniority system rather than a dove-tailed system on a straight date-of-hire basis. The district court dismissed the complaint on jurisdictional ground deferring to the primary jurisdiction of the Interstate Commerce Commission (ICC) which had supervised and approved the merger.

On appeal, the Eighth Circuit found that the district court erred in refusing to exercise its jurisdiction to hear the plaintiffs' claim even though the disputed conduct arose out of an agency regulated merger. The appellate court ruled that a claim for breach of the duty of fair representation is an exception to the primary jurisdiction

doctrine which is ordinarily applied in cases arising out of supervised mergers. *Augspurger*, 510 F.2d at 857–58. Nevertheless, the Eighth Circuit upheld the district court's dismissal of plaintiffs' claim on other grounds finding that plaintiffs had failed to state a claim for breach of the duty of fair representation. Citing *Huffman* and *Hardcastle*, the Eighth Circuit held that seniority rosters need not be limited to strict date-of-hire systems, and that the adoption of an alternative system which worked to the disadvantage of the plaintiffs was not sufficient to establish the type of bad faith or discriminatory conduct necessary to show that the union had breached its duty of fair representation. *Augspurger*, 510 F.2d at 859.

We note that the Seventh Circuit Court of Appeals has reversed the dismissal of a similar claim brought by railroad employees against their union. *See Zapp v. United Transportation Union*, 727 F.2d 617, 627 (7th Cir.1984). In *Zapp*, the Seventh Circuit addressed a similar case brought by railroad employees alleging that they were adversely affected by the adoption of a new seniority system which went into effect as a result of the Conrail merger. The plaintiffs argued that the new system violated a 1974 ICC ruling and was also in violation of the 3R Act. Plaintiffs also brought a claim for breach of the duty of fair representation. The Seventh Circuit affirmed the dismissal of the plaintiffs' regulatory and statutory claims, but reversed the dismissal of the breach of the duty of fair representation claim:

> It is, however, entirely possible that plaintiffs could prove that the Union discriminated against them in agreeing to a seniority consolidation plan that left employees of a very small railroad as low men on the resulting totem pole or did not attempt to alter the seniority system once the IU lines were abolished. Plaintiffs have adequately alleged hostile discrimination against them. We accordingly disapprove this much of the district court's dismissal of the breach of duty of fair representation claim.

*Zapp*, 727 F.2d at 627 (footnote omitted).

The Seventh Circuit did not cite to any other facts which would indicate bad faith or discriminatory intent on the part of the union but, rather, relied solely on the union's decision to negotiate a particular type of seniority which had a detrimental impact on the plaintiffs.

With respect to the Eighth Circuit decision in *Augspurger*, the *Zapp* court stated:

> Defendant UTU argues that *Augspurger* is exactly on point and that the IU employees' fair representation claim should be dismissed on grounds of primary jurisdiction. We disagree. Plaintiffs complain that in negotiating seniority rights, their union deliberately discriminated against employees of a small railroad in order to benefit the larger Penn Central constituency. They also allege that they have essentially no seniority standing because of the abandonment of the Indianapolis track and lack Conrail seniority sufficient to bid for long pool jobs. These claims adequately (although inartfully) state a fair representation claim.

727 F.2d at 627–28.

After discussing the alternatives available to the plaintiffs on remand, the *Zapp* court concluded by stating that "[w]hatever course plaintiffs select, we strongly suggest that they try a more coherent presentation of their case; this court has struggled to fill the gaps in plaintiffs' arguments—an effort which should not be demanded of it." 727 F.2d at 628.

Unlike the Seventh Circuit, we find *Augspurger* precisely on point. Moreover, we are unwilling to "struggle to fill the gaps in plaintiffs' arguments."

We find nothing in the record or in the allegations contained in the plaintiffs' complaint which would show that the UTU's negotiation of the two-tiered seniority system or its subsequent refusals to renegotiate the issue were done in bad faith or with a hostile intent toward the plaintiffs. The mere fact that plaintiffs are a minority group within their union organization and that they were adversely affected by the actions or inactions of the union does not

establish that the union has acted with hostile or discriminatory intent. Therefore, we conclude that the district court was correct in granting summary judgment in favor of defendants on plaintiffs' claim of breach of the duty of fair representation.[9]

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

**9.** Since plaintiffs failed to allege facts sufficient to establish a breach of the duty of fair representation on the part of the Union, then their derivative "conspiracy" claim against Conrail must also fail. *See also supra* note 7.