878 F.2d 383
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED TRANSPORTATION UNION, LOCAL 792, Plaintiff-Appellant,
v.
UNITED TRANSPORTATION UNION, Defendant-Appellee.
 No. 88-3522.
 United States Court of Appeals, Sixth Circuit.
 July 3, 1989.
 
 Before MERRITT and DAVID A. NELSON, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 United Transportation Union Local 792 sued its international union under the Railway Labor Act, 45 U.S.C. Secs. 151 et seq., in a dispute over the distribution of work following a realignment of traffic patterns by the Consolidated Rail Corporation (Conrail). The district court entered summary judgment against the local union on the ground that the action had been commenced more than six months after the local exhausted its internal union remedies. The parties agree that the limitations period was six months, but disagree as to when the period began to run. Finding no error in the district court's resolution of that issue, we shall affirm the district court's judgment.
 
 
 2
 * Local 792 represents Conrail employees who work in train service on railroad lines formerly within the Lake Division of the Pennsylvania Railroad Company (PRR). That railroad merged with the New York Central Transportation Company (NYC) in the late 1960s, and after a bankruptcy of the merged company, the operations of this and other railroads were taken over by Conrail. Other locals of the United Transportation Union (UTU) represent Conrail employees in other divisions of the lines incorporated in Conrail.
 
 
 3
 Local 792 is one of several local unions grouped in a "General Committee of Adjustment" that was headed, for a time, by General Chairman P.V. Hemmer. Mr. Hemmer's jurisdiction covered former PRR lines running between Fort Wayne and a classification yard at Conway, Pennsylvania, north of Pittsburgh, and between Conway and Cleveland.
 
 
 4
 There was another General Committee for UTU locals representing Conrail employees on former NYC lines running between Cleveland and Chicago, and between Chicago and Fort Wayne. That committee was headed by General Chairman L.W. Swert.
 
 
 5
 On December 23, 1981, Conrail notified General Chairmen Hemmer and Swert that the railroad intended to establish through freight service between Toledo and Conway via Cleveland. The Toledo-Cleveland portion of this service came within Chairman Swert's jurisdiction, and the Cleveland-Conway portion within Chairman Hemmer's.
 
 
 6
 Conrail assumed that crews for the new Toledo-Conway service (or "pool," as the service is called for work-assignment purposes) would be selected in accordance with the seniority provisions of Rule 24 of the Conrail-UTU collective bargaining agreement. Rule 24 provided for a division of work among seniority districts on the basis of the ratio between the mileage operated on the service in question within a particular district and the total mileage operated on that service. The December 23 letter indicated that 50 percent of the mileage on the Cleveland-Conway service lay in the Toledo/East Division (a former NYC seniority district in Chairman Swert's jurisdiction), 25 percent in the PRR Lake Division, and 25 percent in the PRR Eastern Division. The seniority districts for both of the latter divisions were in Chairman Hemmer's jurisdiction.
 
 
 7
 On January 5, 1982, Chairman Hemmer sent copies of Conrail's letter to Local Union 792, the members of which were in the PRR Lake Division, and to Local Union 1418, the members of which were in the PRR Eastern Division. Mr. Hemmer's transmittal letter expressed the view that the through service being established between Toledo and Conway via Cleveland represented a permanent diversion of freight from the Eastern Division. Such a diversion, if it existed, would have significance under Article 90 of the UTU constitution; that article provides that when seniority rights are affected by a permanent diversion of traffic from one seniority district to another, "General Committees of Adjustment shall arrange for a fair and equitable division of the work." Historically, it appears, a "fair and equitable division of the work" under Article 90 of the constitution has entailed giving the work to trainmen in the seniority district from which the traffic was diverted, rather than dividing the work in accordance with Rule 24 of the collective bargaining agreement.
 
 
 8
 On January 25, 1982, Chairman Hemmer wrote to Locals 792 and 1418 again, describing a meeting that he and Chairman Swert had held with Conrail a few days earlier to discuss the operation of the proposed Toledo-Conway service. Chairman Hemmer advised the locals that
 
 
 9
 "I stated that my position on this service is that it is permanently diverted freight out of the Fort Wayne, Indiana to Conway, Pa. Interseniority Pool and that for the time being only Eastern Seniority District Trainmen would man the former PRR portion of this service.
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 "This is the same policy that I followed under Article 90 of the U.T.U. Constitution in other freight diversions."
 
 
 13
 The through service between Toledo and Conway via Cleveland was instituted in April of 1982, pursuant to a local agreement between Conrail and the UTU. Half of the crews for trains on this service came from the NYC Toledo/East seniority district and half came from the PRR Eastern seniority district. When relief crews were needed within the PRR Lake Division they were apparently called from that division's extra list, but members of Local 792 did not otherwise get any of the work.
 
 
 14
 Although Local 792 seems to have accepted Chairman Hemmer's determination initially, the head of the local wrote Chairman Hemmer on July 27, 1982, to request that 25 percent of the work on the Toledo-Conway service be given to Lake Division employees--i.e., to members of Local 792. The letter argued that "[i]f the Toledo/East Division employees are entitled to 50% of this work, based on the mileage in their division, then it should follow that the Lake Division employees are also entitled to 25% based on the mileage over the former P.R.R. Lake Division territory."
 
 
 15
 Article 90 of the UTU constitution provides that an unresolved dispute under that Article is to be referred to the International President, who shall assign an officer to assist in resolving the dispute. Failing a resolution the officer is to make a report and recommendation to the President, and the President is to decide the dispute subject to a right of appeal to a Board of Appeals. The President had designated a UTU Vice-President named P.L. Patsouras to assist in resolving a number of other disputes, and the matter raised by Local 792 was referred to Mr. Patsouras.
 
 
 16
 On March 10, 1983, prior to the issuance of a report and recommendation by Vice-President Patsouras, Local 792 wrote the President to ask if "Article 90 of the Constitution of the UTU [can] be used to override the true intent of the Conrail Schedule Rule 24." The letter gave the background of the interdivisional service between Toledo and Conway, and went on to describe a conflict between the positions of Chairmen Swert and Hardin:
 
 
 17
 "Upon establishment of this interdivisional pool in April 1982, General Chairman L.W. Swert of the former New York Central Western District took the position that this pool was to be established under Rule 24 of the Conrail Schedule Agreement.[1] General Chairman P.V. Hemmer took a position that Art. 90 of the UTU Constitution applied and further ruled that the Eastern Division of the former PRR RR had rights to fifty percent of the new established service, thus ruling out the Cleveland [Lake] Division of receiving any equity in this new service. Gen. Chm. Hemmer rules this new interdivisional pool was at least temporarily detoured Conway-Ft. Wayne freight (Eastern Div. Seniority)."
 
 
 18
 The President requested responses from Chairman Swert and from Chairman Hemmer's successor, a Mr. Malizia. The latter replied that he could not find any record of an appeal by Local 792 from Chairman Hemmer's determination that the matter was governed by Article 90. Chairman Malizia also pointed out that the question of a fair and equitable division under that Article was in the hands of Vice-President Patsouras.
 
 
 19
 On the strength of Chairman Malizia's letter, the President advised Local 792 on April 7, 1983, that the time for a formal appeal on the operation of the Toledo-Conway service had expired. On June 6, 1983, Local 792 requested reconsideration of this decision, advising the President that the local had not been given a copy of the pertinent local agreement between Conrail and the UTU and arguing that "we have no document on which to appeal from." The request for reconsideration reiterated that there was a conflict as to whether the work should be divided under Rule 24 or should be handled under the Article 90 provisions governing permanent diversions of traffic:
 
 
 20
 "Gen. Chmn. L.W. Swert's position was when the establishing of this Pool was under discussion that this Pool would be operated under Rule 24 of the Conrail New Schedule Agreement, effective 9/1/81.
 
 
 21
 "Mr. L.W. Swert was not in accord with Gen. Chmn. Hemmer that this was a diversion of service as contended by Mr. Hemmer. Therefore, it can be seen that theirs [sic] was a conflict between the participating Gen. Chmn. as to the proper application of Rule 24 of the Schedule Agreement."
 
 
 22
 On May 23, 1983, shortly before Local 792's letter to the President requesting reconsideration, Vice-President Patsouras issued a final report and recommendation pursuant to Article 90. Mr. Patsouras disclaimed authority to interpret or apply Rule 24, and noted that insofar as it relied on that rule, Local 792 should have sought redress through other avenues. As far as Article 90 of the constitution was concerned, Mr. Patsouras indicated that Chairman Hemmer had acted appropriately in taking it into consideration. Based on information obtained from Conrail, Mr. Patsouras concluded that the trains operated in the new Toledo-Conway service had in fact been diverted from Eastern Division service or could not be traced. He recommended that absent a change of conditions in the future, no "equity"--i.e., no regular work--in the Toledo-Conway service should be given Lake Division trainmen.
 
 
 23
 On June 1, 1983, the President signed a letter concurring in Vice-President Patsouras' recommendation.
 
 
 24
 On August 10, 1983, Local 792 sent the UTU's General Secretary and Treasurer a notice of appeal from Vice-President Patsouras' report and recommendation, as accepted by the President on June 1. The President was unclear as to whether the Local really intended to appeal his decision of June 1, 1983, or his earlier decision that it was too late, under the union constitution, to appeal the local arrangement under which Toledo-Conway service had been instituted in April of 1982. An appeal from the decision of June 1, 1983, as he advised the local, would lie to the Board of Appeals under Article 90; an appeal from the decision on the constitutional question would lie to the union's Board of Directors under Article 75. By letter dated September 23, 1983, Local 792 advised that its appeal was intended to be presented to the Board of Appeals under Article 90.
 
 
 25
 On February 27, 1984, in a unanimous decision, the Board of Appeals denied the appeal. The Board found, as had General Chairman Hemmer, Vice-President Patsouras, and the President, that the trains in the Toledo-Conway service represented traffic diverted from a more southerly route. The board concluded that implementation of Rule 24 would have taken work formerly done by PRR Eastern Division trainmen and given it to the Lake Division trainmen. For this reason, the Board concluded that Chairman Hemmer was correct in applying Article 90 rather than Rule 24.
 
 
 26
 Local 792 did not give up. On June 19, 1984, its attorneys wrote the President asking him to state the UTU's position regarding the inconsistent determinations made by General Chairman Swert and former General Chairman Hemmer. The President replied that "[t]he UTU's position in this matter was set forth in the decision of the Board of Appeals...." Enclosed with the letter was a copy of the Board's decision.
 
 
 27
 On August 16, 1984, the Local's attorneys again wrote the President, stating that his letter was not responsive to their inquiry on the inconsistency. The President replied by letter dated October 19, 1984, explaining that each general chairman had jurisdiction over the Toledo-Conway service as it affected his general committee:
 
 
 28
 "When the matter came before then General Chairman Swert's Committee, he applied Article 24 to the distribution of work to those under his jurisdiction. No appeal was taken from that decision by General Chairman Swert, therefore, it became final. As you know, then General Chairman Hemmer ruled that Article 90 applied to this matter and proceeded accordingly. Your client appealed this decision to the Union's Board of Appeals and was unsuccessful, therefore making General Chairman Hemmer's decision final. Each general chairman made their [sic] decision, one was appealed and one was not, therefore both decisions were final. One can only speculate as to the results of an appeal from General Chairman Swert's decision, however, no appeal was made."
 
 
 29
 Local 792 subsequently attempted unsuccessfully to schedule a meeting with the President. In a letter dated January 10, 1985, the President informed the local that he had "no authority to change the decision of General Chairman Hemmer that was sustained by the Board of Appeals even though another general chairman ruled a different way." He added, in declining the request for a meeting, "I thought I made that clear in the letter I wrote to the lawyer you consulted on this matter."
 
 
 30
 It was on April 18, 1985, that Local 792 commenced the present action for breach of the UTU's duty of fair representation.
 
 II
 
 31
 In DelCostello v. International Brhd. of Teamsters, 462 U.S. 151 (1983), the Supreme Court held that the six-month statute of limitations contained in Sec. 10(b) of the National Labor Relations Act, 29 U.S.C. Sec. 160(b), governs actions brought under Sec. 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185, for breach of the duty of fair representation. In subsequent cases the courts of appeals have uniformly ruled that the six-month limitations period of Sec. 10(b) also governs comparable suits brought under the Railway Labor Act, 45 U.S.C. Secs. 151 et seq. See, e.g., Ratkosky v. United Transportation Union, 843 F.2d 869, 873 (6th Cir.1988); Coyle v. Brotherhood of Railway Clerks, 838 F.2d 1404, 1405 (5th Cir.1988); Smallakoff v. Air Line Pilots Ass'n Int'l, 825 F.2d 1544, 1545 (11th Cir.1987); West v. Conrail, 780 F.2d 361, 363 (3d Cir.1985), aff'd, 481 U.S. 35 (1987).
 
 
 32
 The running of the limitations period is tolled until internal union procedures for resolving the dispute have been exhausted. Dunleavy v. Local 1617, United Steelworkers, 814 F.2d 1087, 1091 (6th Cir.1987). The relatively brief limitations period is thought to further the public policy of swift and uniform resolution of labor disputes, see DelCostello, 462 U.S. at 168-69, while the exhaustion doctrine is thought to encourage private rather than judicial resolution of labor disputes. See Clayton v. International Union, UAW, 451 U.S. 679, 689 (1981).
 
 
 33
 Article 27 of the UTU constitution provides that "[d]ecisions of the Board of Appeals shall be final and binding and shall not be appealable to the convention." The Board of Appeals decided the dispute regarding the Toledo-Conway service on February 27, 1984. Local 792 did not commence this action until April 18, 1985. On the surface, therefore, it would appear that the six-month limitation period expired long before this action was begun.
 
 
 34
 Local 792 attempts rather ingeniously to solve its statute of limitations problem by arguing that the dispute finally decided by the Board of Appeals on appeal from the President's decision of June 1, 1983, was not the dispute out of which this lawsuit arises. The current dispute stems from the conflict between the general chairmen's rulings as to which provision governed, according to the local, while the only matters decided earlier were that there was a diversion of traffic to the Toledo-Conway service and that the division of work on that service was made correctly under Article 90.
 
 
 35
 We are not persuaded that there is any meaningful distinction between the grievance decided by the President and the Board of Appeals in 1983 and 1984 and the grievance put before the President after the Board's decision was issued in February of 1984. It is clear that from 1982 forward, Local 792 was complaining of the inconsistent rulings by the general chairmen. It did so in its opening salvo of July 27, 1982, it did so in the letter it sent the President on March 10, 1983, and it continued to do so in the notice of appeal it sent the Board of Appeals on August 10, 1983. The latter notice said this:
 
 
 36
 "We also understand that the two General Chairmen involved, namely, Mr. L.W. Swert, of the Conrail North District and Mr. P.V. Hemmer of Conrail West and South District did not agree on what Rule was to apply to this Pool.
 
 
 37
 General Chairman L.W. Swert insisted that Rule 24 of the present Conrail Schedule applied and Mr. P.V. Hemmer's position was that Art. 90 of the UTU Constitution governed, therefore, when this Pool went into effect there were two different opinions on its operations."
 
 
 38
 The record leaves no doubt that the conflicting rulings by the general chairmen were an integral part of the overall equity dispute. We agree with the conclusion reached by the magistrate and the district court that the Board's decision of February 27, 1984, marked the exhaustion of internal remedies.
 
 III
 
 39
 Local 792 makes an alternative, but closely related, argument against viewing the decision of the Board of Appeals as the point at which the statute of limitations began to run. Article 27 of the UTU Constitution requires the Board of Appeals to refer "questions arising as to the application of organization law" to the President. Article 16 empowers the President to "interpret all laws of the organization, decide all questions arising therefrom, and decide all other controversies not provided under existing laws of the organization, subject to appeal of the Board of Directors--all in conformity with this Constitution." On the basis of these provisions the local argues that the Board of Appeals had no authority to entertain an appeal based on the application of Article 90. But even if this were true, our decision would be unaffected.
 
 
 40
 Local 792 squarely presented its grievance regarding the inconsistent rulings of the general chairman to the President on March 10, 1983. The grievance was denied. If, as the local now contends, the grievance concerned a question of organizational law, the president's decision could have been appealed to the UTU Board of Directors. Local 792 did not take an appeal to the Board of Directors, although it was advised of its right to do so. Instead, it continued to correspond with the President for more than a year longer. As the district court observed, permitting a plaintiff "to indefinitely delay resolution of labor disputes merely by bombarding his union with tiresome requests for needless review" would thwart the policy of rapid resolution of labor disputes underlying the Railway Labor Act. Dozier v. Trans World Airlines, Inc., 760 F.2d 849, 852 (7th Cir.1985).
 
 
 41
 AFFIRMED.
 
 
 
 [1]
 The record contains only indirect references to the position taken by Chairman Swert. In its brief in this court defendant UTU tells us that Chairman Swert simply recognized that his membership was entitled to half the work under Conrail's proposal; unlike Chairman Hemmer, Chairman Swert could not claim any work for any of his members under the "diversion" provisions of Article 90