996 F.2d 1216
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Bryan J. MOSS, Plaintiff-Appellant,
v.
INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS,
and Consolidated Rail Corporation, Defendants-Appellees.
 No. 92-3542.
 United States Court of Appeals, Sixth Circuit.
 June 30, 1993.
 
 Before: KENNEDY and SILER, Circuit Judges; and CONTIE, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Plaintiff Bryan J. Moss, a railroad worker, appeals the grant of summary judgment in favor of the International Association of Machinists & Aerospace Workers ("IAM" or "Union") and the Consolidated Rail Corporation ("Conrail") in this section 301 of the Labor Management Relations Act (29 U.S.C. § 185(a)) action. Plaintiff claims that the IAM breached its duty of fair representation and that Conrail conspired with IAM to deprive plaintiff of his employment rights. The District Court held that there were no genuine issues of material fact for trial on plaintiff's claims. On appeal, plaintiff contends that: (1) the District Court erred in striking from the record the affidavits of plaintiff and William J. Carson which plaintiff asserts raised issues of material fact; and (2) the District Court erred in its interpretation of various collective bargaining agreements. For the reasons set forth below, we affirm.
 
 I.
 
 2
 Plaintiff Moss was hired by the Erie Lackawanna Railroad Company on October 25, 1958. In 1959, he began working at the Brier Hill Locomotive Shop in Youngstown, Ohio, and established seniority at that location. Thereafter, in 1973, Congress passed the Regional Rail Reorganization Act, as amended, 45 U.S.C. §§ 701-797 ("3R Act"). This Act authorized the formation of Conrail through the acquisition and consolidation of eight financially troubled railroads including the Erie Lackawanna and the Penn Central. Under the 3R Act, Conrail was required to offer employment to the employees of the bankrupt railroads. 45 U.S.C. § 772(b) (1976) (repealed 1981).
 
 
 3
 In 1974, prior to the formation of Conrail, Penn Central had entered into an agreement with the Union to merge two of its seniority districts, the Wheatland, Pennsylvania and Niles-Youngstown, Ohio districts. This agreement provided that those who were hired prior to its effective date would maintain "prior rights"[1] at their old locations--i.e., former Wheatland employees would have prior rights to positions at the former Wheatland locations, and former Niles-Youngstown employees would have prior rights to positions at their former locations. The agreement also stated:
 
 
 4
 Employees hired on or after the effective date of this agreement will be placed on the bottom of the merged roster in seniority order and shall not have prior rights.
 
 
 5
 Thus, while employees hired before the effective date of this agreement would still have prior rights within their previous seniority districts, those hired afterward could exercise their seniority throughout the merged Penn Central district, but not within the two former districts.
 
 
 6
 On May 31, 1975, Lester Bortmas was hired by Penn Central in Wheatland, Pennsylvania, and was placed on the machinists roster. Bortmas' job was in the merged Niles-Youngstown/Wheatland seniority district.
 
 
 7
 Moss and Bortmas were both employed by Conrail on April 1, 1976, when Conrail officially commenced operations. The 3R Act at that time provided that any agreement between Conrail and organized labor unions would ensure that the employees of the bankrupt railroads "who have seniority on the lines, properties or facilities acquired by [Conrail] ... shall have prior seniority roster rights on such acquired lines, properties, or facilities." 45 U.S.C. § 774(a) (repealed 1981). The Act further mandated that Conrail and the labor unions were to negotiate "the procedure for determining the seniority of such employees in their respective crafts or classes on [Conrail's] system which shall, to the extent possible, preserve ... prior seniority rights." 45 U.S.C. § 774(b)(4) (repealed 1981). Pursuant to this Congressional mandate, Conrail and IAM entered into a Seniority Implementing Agreement, which became effective on April 1, 1976. This Agreement provided that:
 
 
 8
 Prior seniority district rights will be maintained within the new regional seniority districts with appropriate symbol designations on the new roster. Employees with a symbol shall have prior rights to positions located within the territory of their prior seniority district.
 
 
 9
 (Emphasis added).
 
 
 10
 This Agreement created, in effect, a two-tiered system for establishing seniority rights. As this Court explained, in a case involving a similar system:
 
 
 11
 First, all Conrail employees were merged into a "dove-tailed" senority roster according to the date each employee was hired by the original railroad. Second, each employee was given a prior right to positions in the operating area of the employee's former railroad. For example, if a position opened up in an area formerly operated by Penn Central, then a worker with ten years seniority with Erie Lackawanna would have priority over another applicant who had five years seniority with Reading Railroad; but, a former Penn Central worker would have priority over both the other applicants regardless of their relative seniority.
 
 
 12
 Ratkosky v. United Transportation Union, 843 F.2d 869, 871-72 (6th Cir.1988).
 
 
 13
 In 1981, the Brier Hill Locomotive Shop was closed and Moss was placed on furlough status. Moss worked periodically over the next few years filling in for other employees on vacation. On October 2, 1985, Conrail posted a notice of a machinist position in the Hazelton Yard (a former Penn Central location), located in the former Penn Central Niles-Youngstown/Wheatland seniority district. Both Moss and Bortmas applied for the position. The collective bargaining agreement in effect at that time required that employees be selected for the position on the basis of seniority. This 1979 Agreement also required that prior seniority rights be enforced:
 
 
 14
 In the awarding of advertised positions or vacancies under the provisions of this rule, bids from employees having prior right seniority in the craft and class in which the vacancy exist, will be given first consideration, even if working out of their craft or class.
 
 
 15
 Brief of Conrail at A-25. Bortmas was awarded the position as a result of his prior seniority rights in the merged Penn Central Wheatland/Niles-Youngstown location.
 
 
 16
 On October 11, 1985, Moss filed a grievance claiming he deserved the position because of his seniority (i.e., he was hired by Erie Lackawanna in 1958, while Bortmas was not hired by Penn Central until 1975). Conrail denied the grievance on October 24, 1985, because it felt Bortmas had prior rights in the seniority district. Moss then pursued his grievance during the next several months. After reviewing plaintiff's file and after several meetings with Conrail representatives, W.D. Snell, the Union's Directing General Chairman, decided that even though plaintiff had greater overall seniority, Bortmas had prior rights to the machinist position which was in his seniority district. Specifically, Snell concluded that because the Wheatland seniority roster merged with the Niles-Youngstown seniority roster in 1974, and Bortmas held prior rights in this merged seniority district on April 1, 1976 (when Conrail was formed), Bortmas was properly awarded the Youngstown position.
 
 
 17
 Plaintiff's Local (Union) Chairman, Anthony J. Carson, appealed Snell's decision to Joseph Burns, President-Directing General Chairman of the Union. On or about July 6, 1987, Snell responded to this appeal by writing to Burns and again indicating that because Bortmas had prior rights to jobs posted in the Wheatland/Niles-Youngstown seniority district, it was proper for Conrail to have awarded the job to Bortmas rather than Moss. On October 20, 1987, Burns informed Carson (by letter) that plaintiff's appeal was denied.
 
 
 18
 On January 4, 1988, plaintiff filed this action against the Union in the United States District Court for the Northern District of Ohio for breach of the duty of fair representation and against Conrail for conspiring with the Union to deprive plaintiff of employment opportunities, under the provisions of the Railway Labor Act, 45 U.S.C. § 151 et seq. The Union and Conrail filed motions for summary judgment on April 12, 1990. In an effort to defeat these motions, plaintiff filed a 49 paragraph affidavit, a supplemental 15 paragraph affidavit, and an affidavit of Union Local Chairman, Anthony Carson, which plaintiff claimed set forth genuine issues of material fact warranting a jury trial. Defendants moved to strike plaintiff's affidavits on the grounds that they contained conclusions of law on which plaintiff is not competent to testify and that they contained matters outside the personal knowledge of the affiants. The District Court found that the affidavits did not comply with Fed.R.Civ.P. 56(e) and ordered them stricken from the record. In its opinion denying the motion for summary judgment, the District Court stated that "[w]ithout the affidavits of plaintiff Moss and Anthony J. Carson ... plaintiff has failed to set forth specific facts showing there are genuine issues for trial on his claims. Accordingly, defendants' motions for summary judgment are granted." Joint App. at 81. This timely appeal followed.
 
 II. Standard of Review
 
 19
 This Court reviews a District Court's grant of summary judgment de novo, making all reasonable inferences in favor of the non-moving party. EEOC v. University of Detroit, 904 F.2d 331, 332 (6th Cir.1990). Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, 477 U.S. 242, 251-52 (1986). "[T]he plain language of rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 332.
 
 
 20
 After reviewing plaintiff's affidavits and the affidavit of William J. Carson, we find that they do not raise genuine issues of material fact for a jury to resolve. Thus, we need not decide whether the District Court erred in striking the affidavit. The material facts giving rise to plaintiff's grievance are undisputed. It is the application of these facts to the 1974 Merger Agreement, the 1976 Seniority Implementing Agreement, the 1979 Collective Bargaining Agreement, and the 3R Act that plaintiff disputes. The interpretation and construction of these agreements, however, are matters of law for the court to resolve.
 
 III. Breach of Duty of Fair Representation
 
 21
 Plaintiff contends that the Union breached its duty of fair representation by failing to fully and completely pursue his grievance. Specifically, plaintiff alleges in his Complaint that he was entitled to the machinist position because: (1) the job originated in "Brier Hill," a former Erie Lackawanna Yard, before being transferred to the Hazelton Yard, a former Penn Central Yard; and therefore, under the "prior rights" arrangement plaintiff, a former Brier Hill employee, was entitled to the job; (2) while plaintiff and Bortmas were both hired by Conrail on the same date (April 1, 1976), plaintiff had more "date of first-hire" seniority (1958) than Bortmas (1975); and (3) Plaintiff was a "protected" employee pursuant to the 3R Act while Bortmas was not.
 
 
 22
 A Union breaches its duty of fair representation when it acts in an arbitrary, discriminatory, or bad faith manner towards any of its members. Air Line Pilots Association v. O'Neill, 111 S.Ct. 1127, 1132 (1991); Vaca v. Sipes, 386 U.S. 171, 190 (1967). The Supreme Court in O'Neill emphasized that the arbitrary prong of the fair representation analysis is very deferential. Id. at 1129. As such, a Union only violates this prong of the analysis when the Union's actions are "so far outside a 'wide range of reasonableness,' " that the actions rise to the level of irrational or arbitrary conduct. Id. at 1136 (quoting Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953)). This Court has also recognized that a union is deemed to have acted in an arbitrary manner only if it has failed to take any action whatsoever in regard to a member's grievance, not simply where the Union fails to act in the manner plaintiff would like. See Poole v. Budd Co., 706 F.2d 181, 183-84 (6th Cir.1983) ("Ordinary negligence, mistake, error or flaws in judgment by the union representative do not constitute a breach of the union's duty.").
 
 
 23
 Under this deferential standard, a union does not breach its duty of fair representation where it makes a good faith determination that a particular grievance lacks merit, so long as some rational explanation is provided for the decision. See Perry v. Million Air, 943 F.2d 616, 619 (6th Cir.1991) (union action that can be rationally explained does not violate a duty of fair representation). In this regard, the union is accorded great deference in balancing its interpretation of the relevant contract provisions against the grievances of individual employees. Hines v. Anchor Motor Freight Co., 424 U.S. 554, 567 (1976); Shamblin v. General Motors Corp., 743 F.2d 436, 438 (6th Cir.1984). Applying this deferential standard, it is clear that the Union has not breached its duty of fair representation.
 
 
 24
 First, plaintiff has never challenged the contractual arrangement between the Union and Conrail determining job seniority by the geographic location of the job at the time it becomes available. Plaintiff himself testified that job seniority at Conrail was determined by geographic location rather than by the work being performed. Joint App. at 547-49. Consequently, because Bortmas had seniority within the merged Wheatland/Niles-Youngstown district, and the Hazelton Yard machinist position was located within this former seniority district, Bortmas had prior rights to the job.
 
 
 25
 Second, plaintiff's argument that the Union breached its duty of fair representation by entering into the 1976 Seniority Implementing Agreement and by failing to preserve plaintiff's "prior seniority" pursuant to section 504(b) of the 3R Act is also without merit. Plaintiff alleges that it was "arbitrary, discriminatory and in bad faith, for the Union to enter into a collective bargaining agreement which was contrary to Congressional intent and which deprived Plaintiff of his statutory right to use his 30 years of 'prior seniority' in obtaining a Conrail job." Joint App. at 329. Section 504(b) provided in pertinent part:
 
 
 26
 On or before the date of adoption of the final system plan by the Board of Directors of the Association ... the representatives of the various classes or crafts of the employees of a railroad reorganization involved in a conveyance pursuant to this Act and representatives of the Corporation (ConRail) shall commence negotiation of a single implementing agreement for each class and craft of employees affected providing ... (4) the procedure for determining the seniority of such employees in their respective crafts or classes on the Corporation's system which shall to the extent possible, preserve their prior seniority rights
 
 
 27
 ....
 
 
 28
 45 U.S.C. § 774(b) (repealed 1981) (emphasis added). In Ratkosky, this Court found that "the two-tiered seniority system negotiated between [the Union] and Conrail which allows workers to exercise their 'prior rights' to bid on positions which become available within their former company is not inconsistent with the language of the statute set forth above [section 504(b) ]." Ratkosky, 843 F.2d at 876. Similarly, in the case at hand, the 1976 Seniority Implementing Agreement, providing for "prior rights," is equally consistent with section 504(b). Moreover, section 504(b) was repealed in 1981. Id. Under plaintiff's theory of the case, IAM's duty to fight Conrail's decision to give Bortmas the Hazelton Yard job did not arise until after section 504(b) was repealed. Therefore, plaintiff's argument that the Union breached its duty of fair representation by failing to preserve his prior seniority in accordance with his interpretation of section 504(b) is "illogical since section 504(b) was repealed before this alleged duty arose." Id. at 876.
 
 
 29
 In addition to claiming the 1976 Seniority Implementing Agreement violated the 3R Act, plaintiff also claims that the February 1, 1974 Merger Agreement denied Bortmas the "prior rights" under which he received the Hazelton Yard job, and thus, the Union should have pursued Moss' grievance. The 1974 Agreement provided that:
 
 
 30
 Employees hired on or after the effective date of this agreement will be placed on the bottom of the merged roster in seniority order and shall not have prior rights.
 
 
 31
 Anthony J. Licate, Director of Labor Relations at Conrail, stated that "[t]he reference to 'prior rights' in the [1974] agreement has been uniformly interpreted to mean that employees hired within the merged seniority district following February 1, 1974 would have seniority rights within the merged district, but would not have prior rights within that seniority district to positions in the former Wheatland or the former Niles-Youngstown seniority districts." Joint App. at 226 (second emphasis added). Thus, there was a rational basis for the Union's decision that, pursuant to the 1974 Merger Agreement (together with the 1976 Seniority Implementing Agreement and the 1979 CBA), Bortmas had seniority. At most, plaintiff has demonstrated that a difference of opinion exists between himself and the Union regarding the interpretation of these agreements, which is insufficient to create an issue of fact as to the Union's duty of fair representation. Vaca, 386 U.S. at 194.
 
 
 32
 Similarly, the Union did not breach its duty of fair representation by processing plaintiff's grievance in a perfunctory manner. See Vaca, 386 U.S. at 195 (union breaches its duty of fair representation when it arbitrarily ignores a meritorious grievance or processes it in a perfunctory manner). In fact, the evidence upon which plaintiff relies disclosed that the Union diligently supervised and processed plaintiff's grievance. Thus, the Union satisfied its duty to fairly represent the plaintiff.
 
 
 33
 Finally, plaintiff has failed to show the Union acted discriminatorily or in bad faith. Plaintiff has presented no evidence of personal animosity between himself and the Union nor has he presented any sort of discriminatory animus on the part of the Union. It was inevitable that whatever decision the Union made, one of its members, either Bortmas or plaintiff, was going to gain at the expense of the other. The mere fact that it was plaintiff who was adversely affected by the actions or inactions of the Union does not establish that the Union acted with hostile or discriminatory intent. Ratkosky, 843 F.2d at 878-79. See also Augspurger v. Brotherhood of Locomotive Engineers, 510 F.2d 853, 859 (8th Cir.1975) (holding that seniority rosters need not be limited to strict date-of-hire systems, and that the adoption of an alternative system which worked to the disadvantage of the plaintiff was not sufficient to establish the type of bad faith or discriminatory conduct necessary to show that the union breached its duty of fair representation).
 
 IV. Conspiracy
 
 34
 Plaintiff further contends that Conrail and the Union conspired to deprive him of employment opportunities. However, "[s]ince plaintiff[ ] failed to allege facts sufficient to establish a breach of the duty of fair representation on the part of the Union, then [his] derivative 'conspiracy' claim against Conrail must also fail." Ratkosky, 843 F.2d at 879 n. 9. See also Loew v. Consolidated Rail Corp., 122 LRRM 2809 (N.D.Ohio 1985), aff'd, 812 F.2d 1407 (6th Cir.1987).
 
 V.
 
 35
 Because no genuine issues of material fact exist and defendants are entitled to judgment as a matter of law, the judgment of the District Court is AFFIRMED.
 
 
 
 [1]
 Anthony J. Licate, Director of Labor Relations of Conrail testified that:
 As used in the railway industry, and by Conrail in particular, the term "prior rights" refers to special seniority rights which may be given to an employee upon the merger of two or more seniority districts by a railroad or upon the merger of two separate railroads. The term "prior rights" refers to rights to positions which were contained in the employee's former seniority district.
 Additionally, the term "seniority district" refers to a geographic area or place operated by a single railroad in which an employee has seniority rights.