Charles ACKLEY, et al., Plaintiffs,

Ronald Coburn, et al.,
Plaintiffs–Appellees,

v.

LOCAL UNION 337, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA, a Voluntary Unincorporated Association, Defendant–Appellant,

H.R. Hillard, Defendant.

No. 89–1135.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 18, 1990.

Decided Aug. 1, 1990.

Peter C. Jensen, argued, Leopold P. Borrello, Saginaw, Mich., for Charles Ackley and Ronald Coburn.

Jerome S. Coleman, Ashley S. Lipson, argued, Coleman, Lipson & Bradford, Farmington Hills, Mich., for defendant-appellant.

Before NELSON and BOGGS, Circuit Judges, and BATTISTI, District Judge.[*]

BOGGS, Circuit Judge.

Plaintiffs, members of Local 486, were employed by Super Food Services at its facility in Saginaw, Michigan. Super Food planned to merge employees of the Saginaw facility with employees of a facility at Vassar, Michigan, whose employees were represented by defendant Local 337. These two facilities were to be closed, and the two sets of employees were to work at a third, new facility.

Pursuant to an agreement between the two locals, Local 337 was to represent employees at the new facility. Prior to the complete merger of the two facilities, some of the plaintiffs, employees of the Saginaw facility and members of Local 486, were laid off. When the merger was completed, some of the plaintiffs were endtailed[1] in seniority to other union members, who were by this time all represented by Local 337. The plaintiffs sued Local 337 for, *inter alia*, breach of its duty of fair representation. The jury returned a verdict in favor of the plaintiffs. We affirm the judgment in all respects.

---

[*] The Honorable Frank J. Battisti, United States District Judge for the Northern District of Ohio, sitting by designation.

[1] When two union locals merge, endtailed employees are those who are given the least seniority in the new, combined union, regardless of their seniority in the old, pre-merger union. Dovetailed employees are those whose seniority in the old, pre-merger union is preserved, and are given this seniority in the new, combined union.

I

In 1980, Super Food Services was doing business at facilities in Vassar and Saginaw, Michigan. Teamsters Local Union 337 represented the employees at the Vassar Unit, while Teamsters Local Union 486 represented the Saginaw employees. In 1980, Super Food announced that it intended to close both the Vassar and Saginaw facilities, and would eventually transfer that work to a new facility at Bridgeport, Michigan.

Officials of the two Locals and Super Food began discussions to determine which Local would be the bargaining representative for the Bridgeport facility. On September 30, 1980, an agreement was signed in Traverse City, Michigan, making Local 337 the bargaining representative for the new Bridgeport employees. Local 486 members, however, retained an "interest" in the Bridgeport site.

On March 1, 1983, Super Food and Local 337 entered into a three-year collective bargaining agreement. This contract specified the terms under which Local 486 members, then employed at Saginaw, would come to work at Bridgeport. The relevant part of this contract read:

> If part or all of the Saginaw facility is closed and the work transferred to Bridgeport, a number of warehouse and driver employees equal to the number required to do the work at Bridgeport will be allowed to transfer, with full seniority, to the new jobs. They will be part of the group under the Bridgeport contract with dovetailed seniority; therefore, a laid off Bridgeport employee with greater seniority than the transferred employee(s) may claim the new job and vice versa. If there is a complete closing resulting from a complete transfer of Saginaw warehouse work to the Bridgeport facility, there will be a combined dovetailing.

This language was based on the understanding reached in the 1980 Traverse City agreement; identical language was written into the collective bargaining agreement between Local 486 and Super Food entered into on September 12, 1983.

Beginning in approximately October 1984, a number of Saginaw employees were transferred to Bridgeport, and their seniority was dovetailed according to the above contract language; after these transfers, fifty-three members of Local 486 apparently remained at Saginaw.

On January 13, 1985, Super Food completely closed Saginaw. Thirty-six of approximately fifty-three employees still on the Saginaw unit seniority list were working as of that date; seventeen workers had been laid off while at Saginaw. Super Food told Local 337 that the work of only twenty-four of these remaining thirty-six workers would be transferred to Bridgeport. Local 337 indicated that only these twenty-four workers would be dovetailed into the Bridgeport unit. On January 14, 1985, the twelve Local 486 employees remaining at Saginaw filed a grievance with Local 486, contending that the contract language required that all members of Local 486 be dovetailed into the Bridgeport facility.

Local 337 contended that the collective bargaining agreement language discussed above meant that only Local 486 members who were performing work which was transferred from Saginaw to Bridgeport would be dovetailed; Local 486 members who were merely performing work that was discontinued, and not transferred, would be endtailed.

Super Food, in response, filed suit against Local 486 in district court on January 30, 1985, requesting that the court enjoin the grievance and order tripartite arbitration among it, Local 486, and Local 337 to resolve the dovetail/endtail issue. The judge assigned to that case was the same one who was to preside over this action. The district court refused to order tripartite arbitration, a decision which Super Food did not appeal.

On June 3, 1985, the twelve non-dovetailed Local 486 members working at Saginaw when it shutdown and seventeen Local 486 members who had been laid off at Saginaw filed suit in the district court against Super Food, Local 486, and Local 337, seeking damages and reinstatement.

Apparently around this time, H.R. "Bud" Hillard, the business agent for Local 337, told one of the endtailed Local 486 members, Michael McGowan, that "We have a million dollars. It doesn't matter, we're going to fuck you guys," referring to members of the former Local 486.

On June 18, Super Food adopted Local 486's reading of the contract language, and dovetailed the remaining twenty-nine members of Local 486 (the remaining twelve non-dovetailed members and the seventeen members already laid off). When these persons were called to work at the Bridgeport facility, they became members of Local 337.

At least one of the reinstated employees received a letter from Super Food that stated:

Both Local Unions and the Company made an agreement on this subject [of dovetailing seniority] in 1980, and included it in their contracts after that. Last September, the Company was surprised to learn that the Local Unions did not agree on the meaning of that agreement....

The time has come to move forward. Rather than let this thing go on for years through the Courts ... we are implementing the contract language by transferring the Saginaw employees to Bridgeport and dovetailing their seniority.... We feel that it is the fairest approach—seniority has to mean something. Not only that, it is clearly in line with both labor contracts, and our prior agreement with both Local Unions.

The issue of back pay was submitted to arbitration between Super Food and Local 486. These plaintiffs dismissed their suit against Super Food and Local 486 without prejudice.

Around July 1985, a number of members of former Local 486 filed grievances with Local 337, contending that they were not receiving their full seniority rights. Local 337 apparently refused to process these grievances.

In December 1985 or January 1986, Local 337 commenced negotiations for a new three-year contract. Local 337, apparently represented by Hillard, argued that only those Local 486 employees whose work was transferred to Bridgeport (who were twenty-four of the fifty-three Local 486 members at Saginaw) should be dovetailed, but Super Food did not agree.

The twenty-nine workers not transferred to Bridgeport before Saginaw was shut down were not allowed to sit on the negotiation teams because, under Local 337 bylaws, bargaining committee members had to be members of Local 337 for at least two years prior to negotiations. These employees sent observers instead.

As the contract deadline of March 1, 1986 approached, Local 337 compromised with Super Food, and agreed that the thirty-six workers remaining at Saginaw at the time it closed would be dovetailed into the Bridgeport facility. However, the seventeen members who were laid off would be endtailed. Super Food accepted this compromise, and the contract was ratified by the Local 337 membership (a membership that included the endtailed workers).

On March 3, 1986, the seventeen endtailed members of former Local 486 and seven members who alleged that Local 337 refused to process their grievances (filed in July 1985) filed suit in Michigan state court against Local 337, Hillard, and Super Food. Local 337 and Hillard removed the case to the district court for the Eastern District of Michigan.

On September 15, 1986, the plaintiffs filed an amended complaint, re-alleging a breach of the collective bargaining agreement claim against Super Food and Local 337, and a breach of the duty of fair representation claim against Local 337. Hillard was not named as a defendant in the amended complaint. On February 3, 1987, Local 337 moved to strike the plaintiffs' jury demand. The court denied this motion.

On November 2, 1987, Super Food moved for summary judgment on the collective bargaining agreement claim, which was granted. Thus, only Local 337 remained as a defendant in the case, and the only issue

remaining was whether Local 337 had breached its duty of fair representation.

On February 24, 1988, Local 337 moved to dismiss for lack of subject matter jurisdiction. Local 337 claimed that the court had no jurisdiction to decide whether it breached its duty of fair representation in the negotiating process, as opposed to breach of the collective bargaining agreement itself. The court denied this motion on March 24.

The trial began on December 1, 1988. Prior to trial, Local 337 and the plaintiffs stipulated that only the existence of a breach was to be determined at trial, but that the amount of damages, if any, would be submitted to an arbitrator following trial.

At trial, McGowan testified about Hillard's alleged abusive "fuck you guys" statement. This statement, however, had not been mentioned in the plaintiffs' answers to any interrogatories. Local 337 objected to this testimony, but the court overruled this objection and allowed it to be admitted.

McGowan also testified that former Local 486 members were referred to as the "Saginaw people" or "former 486 men" at the new Bridgeport plant. Local 337 indicated that these references merely served as a means of identifying the two parties to the dispute.

Richard Metzgar, Vice President for Human Resources at Super Food, who was present at the 1980 Traverse City meeting, testified that the contract language called for complete dovetailing of all former Local 486 members.

Local 337 moved for a directed verdict, which was denied by the court from the bench. On December 7, Local 337 submitted its theory of the case to the court. In part, this theory read:

> So we are now re-hashing (with hindsight) the entire collective bargaining negotiation process, a process for which Congress clearly expressed distaste:
>
> > "in establishing seniority systems there are a variety of legitimate options, and the Courts are careful not to substitute their judgment for those of the authorized labor organization. Moreover, the fact that a seniority system in a collective bargaining agreement favored one group more than another does not in itself constitute a breach of the Union's duty." *Ratkosky v. United Transp. Union,* 843 F.2d 869, 876, 127 L.R.R.M. 3219 (6th Cir.1988).

This case should be dismissed.

The trial court, however, apparently felt that this portion of Local 337's theory of the case represented a legal view, and not an argument. The court struck this language, and in its place substituted "the jury may not substitute its judgment for that of the union."

On December 7, Local 337 submitted the following jury instruction, among others:

> It is not improper for a Union to adjust seniorities; seniority is not a vested right. Moreover the fact that a seniority system favors one group more than another group does not in itself constitute a breach of the Union's duty. *Ratkosky v. United Transp. Union,* 843 F.2d 869, 876 (6th Cir.1988).

However, the court did not use this instruction, but instead instructed the jury that,

> A union may not, without a legitimate purpose, take action favoring some of its members at the expense of others. A union may not neglect the interest of a membership minority to advantage the membership majority.
>
> \* \* \* \* \* \*
>
> The adjustment of seniority is not necessarily improper. Whether it is in a given case, depends on the totality of the circumstances.

Local 337 objected to the court's failure to give its proposed instruction to the jury.

The jury found for the plaintiffs on December 7. On January 17, 1989, Local 337 moved for a directed verdict, dismissal notwithstanding the verdict, judgment notwithstanding the verdict, and for a new trial, all of which the court denied on January 18. Local 337 appealed. The submis-

sion of the issue of damages to an arbitrator was delayed pending appeal.

## II

Local 337 argues that the court erred in denying its motions for directed verdict, dismissal notwithstanding the verdict, judgment notwithstanding the verdict, and for a new trial. Local 337 asserts that it has the power to alter seniority rights retroactively, and to use criteria for defining seniority other than length of service. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); *Aeronautical Lodge v. Campbell,* 337 U.S. 521, 69 S.Ct. 1287, 93 L.Ed. 1513 (1949); *Charland v. Norge Division,* 407 F.2d 1062 (6th Cir. 1969). It argues that because its new seniority system (i.e., one that depends on whether an employee was laid off or not, and not merely length of service) favors certain Local 337 members over some members of the former Local 486 does not necessarily indicate that it breached its duty of fair representation. *Ratkosky v. United Trans. Worker's Union,* 843 F.2d 869, 876 (6th Cir.1988). It points out that other courts have upheld a union's endtailing of previously dovetailed members merged into the union through a new agreement. *Schick v. N.L.R.B.,* 409 F.2d 395 (7th Cir. 1969); *Associated Motor Transport,* 185 N.L.R.B. 631 (1969).

 However, we find that the right to alter seniority is not absolute, and that the alteration of seniority is not immune from an unfair representation attack. *See Ratkosky v. United Trans. Worker's Union,* 843 F.2d 869, 876 (6th Cir.1988). We further find that sufficient evidence of unfair representation was presented at trial to uphold the denial of Local 337's motions. A breach of a duty of fair representation may be demonstrated by the proof of one of the following elements: hostility by the union, arbitrary conduct, reckless disregard of the interests of a unit employee, or bad faith. *Humphrey v. Moore,* 375 U.S. 335, 342, 84 S.Ct. 363, 367–68, 11 L.Ed.2d 370 (1964); *Zapp v. United Trans. Union,* 727 F.2d 617 (7th Cir.1984). Evidence of these elements was presented at trial.

 The plaintiffs argue, and we agree, that Local 337's apparent disregard of the contract language formulated at the 1980 Traverse City meeting, and inserted into both collective bargaining agreements, evinced hostility. *See Local 4076, United Steelworkers of America v. United Steelworkers of America,* 338 F.Supp. 1154 (W.D.Pa.1972). This language was for the benefit of Local 486 members. Local 337 would be representing workers at the new Bridgeport plant in any event, and this language purportedly insured that former Local 486 members would not lose seniority when they joined Local 337 at Bridgeport. Metzgar's testimony supports the plaintiffs' reading of this language, and would allow the jury to find that Local 337 disregarded it by endtailing some former Local 486 members.

We find further evidence of hostility in Hillard's comments to McGowan, and his initial position in the contract negotiations between Local 337 and Super Food in December 1985, when he wanted to endtail all of the remaining twenty-nine Local 486 members. The failure to represent a small group within a union can breach the duty of fair representation. *Zapp v. United Trans. Union,* 727 F.2d 617 (7th Cir.1984). McGowan also testified that former Local 486 members were referred to as "Saginaw people" or "former 486 men," thus suggesting possible animus toward them. Accordingly, we uphold the district court's denial of Local 337's motions for directed verdict, dismissal notwithstanding the verdict, judgment notwithstanding the verdict, and for a new trial.

## III

On December 7, 1988, Local 337 proposed the following jury instruction:

It is not improper for a Union to adjust seniorities; seniority is not a vested right. Moreover the fact that a seniority system favors one group more than another group does not in itself constitute a breach of the Union's duty. *Ratkosky v. United Transp. Union,* 843 F.2d 869, 876 (6th Cir.1988).

The court did not use this jury instruction, but instead instructed the jury that,

> A union may not, without a legitimate purpose take action favoring some of its members at the expense of others. A union may not neglect the interest of a membership minority to advantage the membership majority.

> \* \* \* \* \* \*

> The adjustment of seniority is not necessarily improper. Whether it is in a given case, depends upon the totality of circumstances.

Local 337 argues that the court's failure to give its instruction constitutes reversible error. We disagree.

█ In this circuit, jury instructions must adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision. *Kitchen v. Chippewa Valley Schools*, 825 F.2d 1004, 1010–11 (6th Cir. 1987). We find that the instruction given fulfills these criteria. The instruction pointed out that the adjustment of seniority is not per se improper. It indicated that the union bears a duty to minority members, and that the union may not take an action that abrogates the rights of some members without a legitimate purpose. In these respects, we find no error in the given jury instruction.

## IV

The trial court found that a portion of Local 337's theory of the case set forth a legal view, and not an argument. Thus, the court modified this portion of the theory to read: "the jury may not substitute its judgment for that of the union." Local 337 contends that the tone of the new instruction was arrogant, and less persuasive without the citation to *Ratkosky v. United Trans. Union*, 843 F.2d 869 (6th Cir.1988). It argues that the court committed reversible error by so altering its theory of the case submitted to the jury.

We know of no rule, and Local 337 does not point to any rule, that forbids a trial court from altering a party's theory of the case. Further, the trial court did not re-strict Local 337's arguments to the jury. Thus, Local 337 had, in effect, an opportunity to present its theory of the case without the intervention of the court. We find no error in the district court's presentation of its modification of Local 337's theory of the case.

## V

█ Local 337 contends that the plaintiffs had a duty to exhaust the internal grievance procedures of Local 337 prior to filing an action in court. *Bsharah v. Eltra Corp.*, 394 F.2d 502 (6th Cir.1968). However, we are persuaded that, when plaintiffs allege unfair representation during the course of contract negotiations, they have no duty to exhaust intra-union remedies before filing their claims. *Storey v. Teamsters Local 327*, 759 F.2d 517 (6th Cir.1985). The plaintiffs in *Storey*, like the plaintiffs here, alleged that their union "bargained away substantial benefits relating primarily to seniority." *Id.* at 519. The court in *Storey* did not require the plaintiffs to exhaust intra-union remedies prior to filing this claim.

The plaintiffs here have alleged such unfair representation in the collective bargaining process, and some of the plaintiffs have also claimed that they filed grievances but that the grievances were not processed. In light of these allegations, we hold that the plaintiffs were not required to exhaust intra-union remedies prior to filing this action.

## VI

█ At trial, Local 337's counsel asked plaintiff Ronald Coburn whether any complaints about Local 337's desire to endtail certain employees were made to Local 337. Coburn indicated that he did not make any such complaints. Plaintiffs' counsel then asked McGowan on direct whether any such complaints had been made. McGowan indicated that he had complained to Hillard, and testified that Hillard said in response that Local 337 was going to "fuck you guys," referring to members of the former Local 486. Hillard's statement, however, had not been mentioned in answers to inter-

rogatories served on the plaintiffs. Local 337 objected to this testimony, since it had not previously been noted in the responses to interrogatories.

The court, however, admitted the statement, ruling that Local 337's previous question to Coburn about complaints to Local 337 had essentially invited this response from McGowan on direct. Local 337 contends that the admission of this statement when it had not been mentioned in previous interrogatories constitutes reversible error, in particular because this is the only statement at trial that directly suggested discrimination on its part.

We find no merit in Local 337's argument on this point. We agree with the trial court that Local 337's questioning invited this statement. Local 337 suggested through its questioning that no complaints had been made to the union. McGowan's testimony, elicited by the plaintiffs' lawyer, related to complaints made to the union, and McGowan's testimony about Hillard's statement to him was given in this vein.

Further, at trial, Local 337 immediately attacked McGowan's statement and tried to impeach him, citing answers to interrogatories that did not mention this statement. The issue of McGowan's credibility in general, and the believability of this statement in particular, was before the jury.

## VII

Local 337 argues that the court exceeded "its authority and the bounds of fairness" when it initially refused to order tripartite arbitration on March 26, 1985, and then allowed plaintiffs to sue Local 337 over essentially the same issue.

We find this argument wholly unpersuasive, on at least two grounds. First, the district court's refusal to order tripartite arbitration was not only in a different case, but was one predicated on a different set of legal theories. We simply do not see how the outcome in that case should affect the outcome in this one. Second, we know of no legal theory, and Local 337 does not cite any, that implicates "bounds of fairness." Certainly, Local 337 does not argue, nor could it do so persuasively, that the plain-

tiffs are in any sense estopped from requesting the relief they seek. In the absence of legal arguments supporting this claim, we refuse to grant any relief.

## VIII

Local 337 contends that the district court committed reversible error by the prejudicial manner in which it treated Local 337's counsel as compared to plaintiff's counsel. These allegations cover not only the trial but also numerous hearings that preceded the trial. In particular, Local 337's counsel suggests that, because he was from Detroit, he was treated poorly by the district court sitting in Bay City in comparison to the plaintiff's counsel from Saginaw (which is in the general vicinity of Bay City). We find no basis in the record for Local 337's contentions. The instances of prejudice cited by Local 337 in its brief are simply unpersuasive. Accordingly, we find no reversible error in these actions of the district court.

## IX

On February 24, 1987, Local 337 filed a motion to dismiss for lack of subject matter jurisdiction. Local 337 argued that the case did not involve an alleged breach of a collective bargaining agreement with Super Food, but rather an alleged breach of the duty of fair representation in respect to contract negotiations. In this regard, Local 337 asserted that the district court had no jurisdiction, since section 301 pertains only to breaches of a collective bargaining agreement. *See, e.g., Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). The court denied this motion and Local 337 appeals this denial.

We hold that the district court did not err in denying Local 337's motion. Federal courts have jurisdiction over cases alleging a breach of the duty of fair representation arising out of collective bargaining agreement negotiations. *Truck Driver's Local 586 v. N.L.R.B.,* 379 F.2d 137 (D.C.Cir.1967). In a case involving an allegation that a union negotiator bargained away seniority rights in a collective bar-

gaining agreement negotiation, this court found that the district court had jurisdiction. *Storey v. Teamsters Local 327*, 759 F.2d 517, 518 (6th Cir.1985). In *Storey*, this court stated:

> [B]y asserting that [the union] violated section 9(a) of the Labor Act and relying on 28 U.S.C. § 1337, we believe the plaintiffs properly framed their complaint for district court jurisdiction.

759 F.2d at 523. Accordingly, the district court did have jurisdiction to hear this action.

■ We note that the plaintiffs did not state in their amended complaint that Local 337's alleged unfair representation violated section 9(a) of the NLRA, or that the basis for the court's jurisdiction was 28 U.S.C. § 1337. The plaintiffs, however, persuasively argue that their reliance on section 9(a) and 28 U.S.C. § 1337 may be inferred from the pleadings and the course of this case. The record and pleadings before us demonstrate that both parties to this action assumed and understood that the plaintiffs' action was predicated on a violation of section 9(a). For this reason, we find that a failure to plead such a violation explicitly, or the jurisdictional statute specifically, is not fatal to their maintenance of the action. *See In re Carter*, 618 F.2d 1093 (5th Cir.1980).

## X

■ Prior to trial, both parties agreed that the court was to determine only the question of whether Local 337 breached its duty of fair representation; the amount of damages, if any, would be determined by an arbitrator following trial if the plaintiffs prevailed. At least once during the trial, Local 337 tried to discuss the existence, as opposed to the amount, of damages. The court refused to allow it to broach this matter, contending that this issue was for the arbitrator.

Local 337 contends that the existence of damages is an element of the case. It claims that the plaintiffs have sought only equitable relief (such as rearrangement of seniority), or alternatively, have not made clear what relief they request. Thus, Local 337 argues that the plaintiffs have failed to allege that they suffered any damage, and thus Local 337 should have been permitted to argue at trial that the plaintiffs should be denied relief on this basis.

The plaintiffs, however, have pleaded damages, specifically loss of wages from loss of seniority, loss of overtime assignments, loss of weekend overtime, and physical and mental damages. Accordingly, we do not find that the trial court's refusal to allow discussion of damages, in light of the stipulation between the parties, constitutes reversible error.

## XI

■ Local 337 moved to strike the plaintiffs' request for a jury trial, and the court denied this motion. Local 337 now argues that the court erred by denying this motion. It states that the plaintiffs have no right to a jury trial. *Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). In particular, Local 337 argues that a breach of the duty of fair representation did not exist at common law, and thus affords the plaintiffs no right to a jury trial.

Local 337 further argues that the remedy the plaintiffs seek is equitable: reinstatement and back pay. Courts have held that no right to a jury trial exists for equitable remedies. *See Deringer v. Columbia Trans. Union*, 866 F.2d 859 (6th Cir.1989); *Slack v. Havens*, 522 F.2d 1091 (9th Cir.1975). *Cf. Wood v. Teamsters Local 406*, 807 F.2d 493 (6th Cir.1986), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987).

In resolving this issue, however, we must focus primarily on the remedy requested. *See Hildebrand v. Board of Trustees*, 607 F.2d 705 (6th Cir.1979). We note that the plaintiffs request money damages, such as those for loss of overtime and weekend assignments and demotions, as well as exemplary damages for suffering. *See Curtis v. Loether*, 415 U.S. 189, 197, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) (back pay need not be equitable relief). Money damages were available at common law, and in this

respect plaintiffs have alleged a remedy available at common law. *Id.* at 194, 94 S.Ct. at 1008. Accordingly, we affirm the trial court's refusal to strike the jury demand.

## XII

For the foregoing reasons, the judgment of the district court is AFFIRMED in all respects.

DAVID A. NELSON, Circuit Judge, dissenting.

I do not believe that the evidence presented at trial was sufficient to support a finding that the union violated its duty of fair representation in negotiating the 1986 collective bargaining agreement. Without reaching any of the other issues raised on appeal, therefore, I would reverse the judgment entered by the district court and direct the entry of judgment in favor of the union.

## I

It is undisputed that when the Traverse City agreement was negotiated in 1980, there was full employment at both of Super Foods' warehouse facilities in Vassar and Saginaw; there were no major layoffs at either facility. The company's chief negotiator testified, moreover, that "we visualized that when we combined [the operations] ... most people would still be working and therefore it was proper to dovetail their seniority." That, presumably, is why the Traverse City agreement began with a reference to "the work [being] transferred to Bridgeport," and concluded with a sentence saying that "[i]f there is a complete closing [of the Saginaw facility] resulting from *a complete transfer of Saginaw warehouse work to the Bridgeport facility,* there will be a combined dovetailing." (Emphasis supplied.)

Four years later a very different situation existed. Although the Vassar opera-

tions had apparently been transferred to Bridgeport in their entirety, and although the Saginaw facility was still in operation, some of the operations conducted at Saginaw had been terminated altogether instead of being transferred to Bridgeport. One segment of the business was abandoned, and the jobs associated with the discontinued operations were simply abolished.

Faced with this new and disturbing situation, Mr. Hillard, the Local 337 business representative who had agreed to have the Traverse City agreement incorporated in the local's 1983 collective bargaining agreement and who was responsible for administering the agreement, sought guidance from his international union. Mr. Hillard wanted to know how the agreement should be applied if the condition on which a complete dovetailing depended—"a complete transfer of Saginaw warehouse work to the Bridgeport facility"—could no longer be fulfilled. One possibility, as Mr. Hillard testified, would be to follow the practice that was common elsewhere in the freight and warehousing industry:

"If you have a job, [and] your job goes someplace else, you follow the work. You have a right to follow the work.

If you don't have a job you don't have a right to go over and take anybody's job away from them."

Under date of November 9, 1984, Mr. Hillard received a reply from an international union official named Jorgensen. Mr. Jorgensen could speak to the issue with some authority, because it was he who had proposed the language adopted at Traverse City in 1980. Mr. Jorgensen advised Mr. Hillard that only those Saginaw employees who were needed to perform work actually being transferred from Saginaw to Bridgeport could retain their seniority.

Based on information supplied by the company,[1] Mr. Jorgensen told Mr. Hillard that

"Barring deaths, retirements, quits or other losses of seniority, the Saginaw seniority list [as of January 13, 1985] will consist of 54 persons, 37 of whom are actively employed ... and the Bridgeport seniority list will con-

---

**1.** In September of 1984, when the company advised Mr. Hillard that the Saginaw facility would be closed on January 13, 1985, the company gave the following personnel projections:

"Of the 37 members presently working at the Saginaw, Michigan operation, 28 would have the right to dovetail into the seniority list of the Bridgeport, Michigan operation, filling the 28 jobs available.

The remaining 9 presently employed, and 17 additional [laid-off employees] on the seniority list, would be eligible for recall according to seniority as jobs become available in the future, and would be placed at the bottom of the seniority list at that time."

Mr. Hillard was obviously caught between a rock and a hard place. If he interpreted the Traverse City agreement in the way the redundant Saginaw employees wanted it interpreted, up to 26 men who had been working at Bridgeport for some time would find themselves out of work. Their discomfiture at losing their jobs would hardly be assuaged by the knowledge that they were being replaced by Saginaw employees whose job functions had been abolished, rather than being transferred to Bridgeport, and 17 of whom had already been laid off indefinitely.[2] If Mr. Hillard interpreted the Traverse City agreement as its author said it ought to be interpreted, on the other hand, 26 Saginaw people were going to be unhappy with him. Very unhappy, as it turned out.

"I was caught in the middle," Mr. Hillard testified. "There were two competing groups, two people wanting one job. It was an impossible situation." The accuracy of this assessment seems incontestable.

With the support of the elected leadership of Local 337—a 10,000 member union that was not shown to have any reason for hostility toward either of the relatively small groups that were in direct competition for jobs at Bridgeport—Mr. Hillard chose to follow the interpretation espoused by Mr. Jorgensen of the international union.

The company did not reject the Hillard/Jorgensen approach initially, and for the first six months after the Saginaw facility was closed, seniority was handled in accordance with the union's interpretation of the agreement. The dissatisfied Saginaw employees sued the company and the local unions early in June of 1985, however, and at that point the company performed what Mr. Hillard described as a "flip-flop;" it started applying the contract in accordance with the plaintiffs' interpretation, rather than the union's.

The change in the company's position was announced on June 18, 1985. On the following Sunday afternoon, according to the testimony of plaintiffs McGowan and Ackley, Business Agent Hillard had an exchange of words with the two men in the parking lot of the Bridgeport facility. Messrs. McGowan and Ackley contend that Mr. Hillard expressed himself somewhat indelicately on that occasion; pointing out that the union's financial resources were far greater than the plaintiffs', Mr. Hillard supposedly delivered himself of a vulgarity indicating that the union was determined to win the lawsuit that McGowan, Ackley and others had brought against it earlier that month.[3]

sist of 180 persons as of the same date. The number of persons estimated as required to perform the Saginaw work transferred to Bridgeport as of January 13 is 28...."

**2.** The company admitted that even if the Saginaw plant were not closed, most of the men who had been laid off there would never be recalled.

**3.** The jury may or may not have believed that the exchange really took place. Mr. Hillard flatly denied it, and his travel records indicated that there was no Sunday in June when he was even in Bridgeport. In response to an interrogatory requiring Mr. McGowan to detail every act of Hillard's that was claimed to manifest "hostility" toward him, moreover, Mr. McGowan made no mention of the alleged exchange in the Bridgeport parking lot.

Mr. McGowan's answer to the interrogatory did refer to a union meeting held at the Comfort Inn in Saginaw on December 15, 1985. That meeting was called for the purpose of discussing the union's position in negotiations with the company over the new contract that was to become effective in March of 1986. The interrogatory answer says that Hillard "stated he was going to take the seniority rights away from former Saginaw employees. If we didn't like it, we were to sue him. And the union has never lost a case."

Mr. Hillard readily admitted saying at the December meeting that the disaffected Saginaw people could sue him if they disagreed with the union's position:

For a considerable time during the negotiations over the 1986 collective bargaining agreement, Mr. Hillard continued to adhere to the position that seniority should be handled in accordance with the ruling made by the international union's Mr. Jorgensen; that is, that the seniority of Saginaw employees should be preserved where the work they had been performing at the Saginaw facility was moved to Bridgeport, but not otherwise. The Saginaw employees were not eligible for election to the bargaining committee, but they knew what position Mr. Hillard was taking, because he arranged for them to have observers at the negotiations.

The chief negotiator for the company, a Mr. Arnst, testified that while it was highly unusual to have observers at collective bargaining sessions, there was nothing unusual in Mr. Hillard's adhering to the position adopted by his international union. Mr. Arnst testified further that at no time during the negotiations did he have the feeling that Mr. Hillard was "personally hostile" to the Saginaw people.[4]

Shortly before illness forced him to drop out of the negotiations, Company Negotiator Arnst proposed a compromise under which the small group of employees who were still actively working at the Saginaw facility when it was closed in January would have their seniority dovetailed with that of the people at Bridgeport. Mr. Hillard and the union bargaining committee accepted this compromise, and it was made

a part of the new collective bargaining agreement.

In accepting the company's proposal, the jury concluded, the union violated the duty of fair representation it owed the 17 Saginaw employees who had been on indefinite layoff when the Saginaw facility was closed. On the record before us, and under this court's decision in *Ratkosky v. United Transportation Union*, 843 F.2d 869 (6th Cir.1988), it seems to me that the question should not have been submitted to the jury; the union, in my view, was entitled to judgment as a matter of law.

## II

When seniority rosters are consolidated in a situation where a business is being down-sized, as the Seventh Circuit pointed out in *Zapp v. United Transportation Union*, 727 F.2d 617, 620 (7th Cir.1984), "[i]nevitably, at least some workers will be less well off than they were prior to facility or seniority consolidation...." It is self-evident that "a union cannot, in a situation of job contraction, easily satisfy all its members." *Id.* This is so, the Seventh Circuit explained, "not because of legally cognizable wrongdoing, but because [the disadvantaged employees] had the ill fortune to be part of a declining industry." *Id.*[5]

The plaintiffs in the case at bar likewise had the ill fortune to be part of a shrinking

---

"There were people who were making statements from the floor. One was making a statement he was going to break me in half, and another one was making a statement he was going to sue me. So I took the less of the two evils. I said: go ahead, sue me."

"To say the least," Hillard explained elsewhere in his testimony, the atmosphere at the December meeting with the Saginaw people was "charged:"

"There was a lot of shouting and yelling, and quite frankly, I was a mother fucker and I was a no good son of a bitch, I was going to be sued, they were going to take away my house, my wife, my car and my first born child. It then went downhill from there."

**4.** Mr. Hillard himself testified that he had no personal relationship with any of the individuals in either of the contending groups. Mr. Hillard was responsible for some 1,500 employees in 30 different companies. The trial record

contains no evidence of any improper motive behind Mr. Hillard's desire that the 20-odd jobs at issue should be retained by Bridgeport people, rather than being given to Saginaw people whose jobs had been abolished.

**5.** Notwithstanding the foregoing observations, the *Zapp* court held that a claim of breach of the duty of fair representation should not be dismissed on the pleadings where the pleadings adequately alleged hostile discrimination against the plaintiffs. 727 F.2d at 627. It is one thing adequately to allege hostile discrimination in the pleadings, of course, and quite another thing to establish hostile discrimination by probative evidence introduced at trial. For reasons to which *Zapp* alluded, the burden of actually proving hostile discrimination in a down-sizing situation is likely to be a very difficult one.

business. Because there were not enough jobs to go around at Bridgeport, some employees who wanted to work there and who felt they had legitimate claims on jobs at the facility were inevitably going to lose out. It was up to the union and the company to decide, through the collective bargaining process, who the individual winners and losers would be in this zero-sum game.

Seniority was clearly a proper subject for bargaining notwithstanding the company's decision in June of 1985 to apply the soon-to-expire 1983 agreement in a way that differed from the interpretation given it by Local 337 and the international union. "Seniority rights are not vested," *Schick v. NLRB*, 409 F.2d 395, 398 (7th Cir.1969), "but 'derive their scope and significance from union contracts....'" *id.*, quoting *Aeronautical Industrial District Lodge 727 v. Campbell*, 337 U.S. 521, 526, 69 S.Ct. 1287, 1290, 93 L.Ed. 1513 (1949). "Thus, seniority is a valid subject matter for the collective bargaining process." *Schick, id.*, citing *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964).

In negotiating seniority systems, as we declared in *Ratkosky v. United Transportation Union*, 843 F.2d 869, 876 (6th Cir. 1988), "there are a variety of legitimate options, and the courts are careful not to substitute their judgments for those of the authorized labor organizations. Moreover, the fact that a seniority system in a collective bargaining agreement favors one group more than another does not in itself constitute a breach of the union's duty." In this connection we quoted the following passage from *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), a passage that is equally pertinent here:

"Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion."

In *Hardcastle v. Western Greyhound Lines*, 303 F.2d 182 (9th Cir.), *cert. denied*, 371 U.S. 920, 83 S.Ct. 288, 9 L.Ed.2d 229 (1962), which we endorsed in *Ratkosky*, 843 F.2d at 877, the Ninth Circuit observed that it "is a fact inherent in the democratic process and the principle of majority rule" that portions of an electorate may be dissatisfied with the result of an election. *Hardcastle*, 303 F.2d at 187. "An *essential element*, then," both the *Hardcastle* and *Ratkosky* panels read *Huffman* as teaching, "necessary to raise a limitation upon a union's discretion in bargaining with respect to seniority rights[,] is *a bad faith motive*, an intent to hostilely discriminate against a portion of a union's membership." *Hardcastle*, 303 F.2d at 182, as quoted in *Ratkosky*, 843 F.2d at 877 (emphasis supplied).

As I read the trial record in the case at bar, it simply does not contain proof of the "bad faith motive" that is an "essential" part of the plaintiffs' case. This is not a case where the union was motivated to discriminate against one faction on racial grounds, as in *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). It is not a case where the union was motivated to discriminate against one faction because that group had resisted unionization, as in *Teamster Local Union No. 42 v. NLRB*, 825 F.2d 608 (1st Cir.1987).[6] And this is not a case where a motive to discriminate unfairly and in bad faith could be inferred from the fact that the union's position was "unsupported by any rational argument

---

6. It is true that the people from Saginaw had initially belonged to Local 486, while the people who went to Bridgeport first had always belonged to Local 337. These were both Teamster locals, however, and Mr. Jorgensen—the international union official whose interpretation of the Traverse City agreement formed the basis of Mr. Hillard's bargaining position—could not possibly have had any parochial interest in favoring Local 337 members over individuals who had formerly belonged to another Teamster local.

whatsoever." See *Truck Drivers and Helpers Local Union 568 v. NLRB*, 379 F.2d 137, 141 (D.C.Cir.1967). Like the Hillard/Jorgensen interpretation of the Traverse City agreement, the bargaining position taken by the union in negotiating the 1986 collective bargaining agreement was supported by an eminently rational argument. If the proper interpretation of the Traverse City agreement is a question of law, moreover, it seems to me that Mr. Jorgensen's interpretation of his own handiwork is probably the correct one. As I read the Traverse City agreement, it contemplates "a complete transfer of Saginaw warehouse work to the Bridgeport facility," and not a partial abandonment of Saginaw warehouse work.

The mere fact that Mr. Hillard may have uttered a common obscenity in telling Messrs. McGowan and Ackley that the union was going to win the lawsuit they had recently filed against it could not have told the jury anything about the *bona fides* of the union position that had prompted the plaintiffs to sue the union in the first place. And the record establishes without contradiction that Teamsters from Saginaw could be no less vulgar in speaking to Mr. Hillard than he allegedly was in speaking to them. (Perhaps the Bridgeport people would have been equally abusive if it had been their ox that was being gored.)

Also unpersuasive, it seems to me, is the circumstance that former Local 486 members were referred to as "Saginaw people" or "former 486 men." That is what they were, after all; both terms are descriptive, and neither one would seem to be a term of opprobrium. See *General Drivers and Helpers Union No. 229*, 185 NLRB No. 84 (1970), where the National Labor Relations Board indicated that repeated use of the term "Binghamton men" had no probative value because it was merely "a convenient way of identifying employees who were transferred from the Binghamton unit...."

Given the dearth of evidence pointing to a bad faith motive in this case, I am satisfied that a finding for the plaintiffs could rest only on speculation. And if trial records as thin as this one can support findings of liability on account of union decisions that are essentially legislative in character, one wonders whether lawsuits such as this may not, over time, drive some unions out of existence or otherwise damage the collective bargaining process. See *Humphrey v. Moore*, 375 U.S. 335, 349–50, 84 S.Ct. 363, 371–72, 11 L.Ed.2d 370 (1964), where, in declaring that a union should not be "neutralized" where two sets of employees differ over an issue, the Supreme Court said that

> "Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance process."

To allow recovery here, I believe, is to place union officials like Mr. Hillard and Mr. Jorgensen in a Catch–22 situation. Suppose that Mr. Jorgensen had told Mr. Hillard in 1984 that the Traverse City agreement required complete dovetailing whether or not there was a complete transfer of Saginaw work to Bridgeport. Suppose that Mr. Hillard had taken a comparable position in the collective bargaining negotiations that began late in 1985. If, as a result of that bargaining position, Saginaw men whose work had been abolished were permitted to displace Bridgeport men whose work had not been abolished, it is entirely possible, if not probable, that the hostility of the disadvantaged Bridgeport people toward the union representatives would have equalled or surpassed that manifested by the Saginaw people in the present situation. Throw in a little strong language on both sides, and under the precedent we are setting in this case the Bridgeport people would seem to have a pretty good lawsuit against their union.

It is difficult for me to square that result with the logic of *Ratkosky, Huffman,* and *Humphrey v. Moore*. Where any negotiated agreement will necessarily have an adverse effect on one set of employees or another, I believe there must be actual proof of a bad faith motive before the union can be required to respond in damages to the employees whose wishes are

not accommodated. Finding no such proof here, I respectfully dissent.