Thomas N. COTTER, Jr., Plaintiff,

v.

DAIMLERCHRYSLER, f/k/a Chrysler
Corp., Defendant.

No. 99–CV–71524–DT.

United States District Court,
E.D. Michigan,
Southern Division.

March 7, 2000.

Stephen Linden, Southfield, MI, for plaintiff.

Johanna H. Armstrong, Auburn Hills, MI, for defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This hybrid Section 301 breach of contract action is presently before the Court on the Motions for Summary Judgment filed by Plaintiff Thomas N. Cotter, Jr. and Defendant DaimlerChrysler Corporation ("referred to herein as 'DaimlerChrysler' or 'DCC' "). Each party has responded/replied to the opposing party's motion. Having reviewed the parties' respective motions, briefs and supporting documents, and having heard the oral arguments of counsel at the hearing held on February 24, 2000, the Court is now prepared to rule

on this matter. This Opinion and Order sets forth the Court's ruling.

## II. *PERTINENT FACTS*

Plaintiff Thomas N. Cotter, Jr., is a former DaimlerChrysler salaried employee whose employment relationship with DCC was governed by the collectively-bargained "Agreement for Engineering, Office and Clerical Workers" entered into by his employer and the UAW ("the CBA"). At the time of his termination, Plaintiff was employed at the Auburn Hills Tech Center as a Product Designer II.

*Plaintiff's 1997 Discharge*

In 1996–97, Plaintiff began demonstrating problems with attendance at work. From January 1996 through February 1997, Plaintiff was absent from work 28 days and tardy on numerous other occasions. [See Defendant's Ex. 3.] This pattern of excessive absenteeism apparently was not Plaintiff's first. The record evidence of this matter indicates that as a result of attendance problems, Plaintiff received a written warning in January 1992; two suspensions (of one-day and three-days) in 1993; a five-day suspension in 1994; and another five-day suspension in 1995. *Id.*

In early January 1997, Plaintiff was suspended for 10–days as a result of his poor attendance. *Id.* Cotter returned from this suspension on January 17, 1997. He worked for less than two weeks and then took five days of vacation January 30th through February 5th. He was to return to work following that vacation on February 6th, but did not report as scheduled and did not call in. Apparently, this was the "straw that broke the camel's back" as Plaintiff was discharged for excessive absenteeism on February 10, 1997.

*Plaintiff's Reinstatement*

On Plaintiff's behalf, the UAW filed a grievance to contest his discharge in accordance with the collectively-bargained grievance procedures set forth in the CBA. The grievance was settled through a negotiated "Conditional Reinstatement" or "last chance" agreement. Plaintiff signed this agreement on July 28, 1997. [See Defendant's Ex. 5.]

The Conditional Reinstatement Agreement provided, in pertinent part:

Your Conditional Reinstatement is for a twelve (12) month **active on roll** period beginning with the date of your reinstatement.

Your reinstatement date is 7/28/97.

Following your return to work and during your Conditional Reinstatement period, you will be subject to the following conditions and any violation of these conditions will be grounds for immediate discharge.

Any unexcused absence shall result in your immediate discharge. The seventh (7th) excused casual absence shall result in your immediate discharge. (*Each day* of excused absence, whether separate or consecutive shall count as one absence [emphasis in original].)

[Defendant's Ex. 5, Conditional Reinstatement Agreement, ¶¶ 3–4A. (emphasis added) ]

Plaintiff signed this agreement acknowledging,

I understand and agree that failure to meet any one or any part of these conditions are grounds for immediate discharge. I further understand that if I am reinstated pursuant to the foregoing and subsequently discharged, I will not be afforded another reinstatement opportunity. I further understand that any grievance submitted on my behalf for discharge under this agreement can only be to establish innocence or guilt, not the severity of the penalty.

*Id.*

At the meeting where Plaintiff accepted the terms of the Conditional Reinstatement, the agreement was read to Plaintiff sentence by sentence, so that he could ask questions if he did not understand any provision. Plaintiff testified in his deposition that he asked no questions. [Plaintiff's Dep. p. 61.] Defendant further states that it was specifically communicated to

Plaintiff at this meeting that any time he was not at work (i.e., on "salary continuation"[1] or off-roll time) would extend the 12–month active on-roll period that he remained subject to the terms of the Conditional Reinstatement Agreement.[2]

*Plaintiff's Attendance After Executing the Conditional Reinstatement Agreement*

Following Plaintiff's execution of the Conditional Reinstatement Agreement, Plaintiff was on salary continuation for the following 46 days of absence:

| | | | |
|---|---|---|---|
| 10/06/97 | through | 10/13/97 | 8 days |
| 02/19/98 | through | 02/22/98 | 4 days |
| 04/08/98 | through | 04/13/98 | 6 days |
| 06/10/98 | through | 06/21/98 | 12 days |
| 06/24/98 | through | 06/30/98 | 7 days |
| 07/30/98 | through | 08/03/98 | 5 days |
| 08/06/98 | through | 08/09/98 | 4 days |

Plaintiff admits that he was on salary continuation for these periods of absence.

Further, during the term of the Conditional Reinstatement Agreement, Plaintiff also incurred the following six "excused" or casual absences:

| | |
|---|---|
| 12/02/97 | Flu |
| 12/03/97 | Flu |
| 04/01/98 | Gastro problem |
| 04/27/98 | Illness (unspecified) |
| 04/28/98 | Illness (unspecified) |
| 06/02/98 | Sinus |

Plaintiff does not dispute that he incurred the above casual absences.

On August 18, 1998, Plaintiff was again absent, this time to take his girlfriend to the doctor. Plaintiff called in and stated that he would be late, but then was a no-show for the entire shift. Upon his return to work the next day, August 19, 1998, Plaintiff was called into a meeting and informed that he was in violation of the Conditional Reinstatement Agreement and that he was being suspended pending an investigation into his unexcused absence.

At the urging of his union representative, Plaintiff obtained documentation from his girlfriend's doctor. This documentation changed Plaintiff's absence from an "unexcused" absence to an "excused" one.

However, because this was Plaintiff's seventh excused or casual absence, he was still in violation of the Conditional Reinstatement Agreement. Therefore, on August 20, 1998, his suspension was converted to a discharge.

Upon his discharge, the UAW filed a grievance on Plaintiff's behalf. With regard to this grievance, Plaintiff's union representative was Darrin Raley. Raley was not the union steward who represented him at the time of the execution of the Conditional Reinstatement Agreement. At that time, the union steward was Robert Hoetger.

Raley initially argued that Plaintiff's August 18, 1998 absence was not in violation of the Conditional Reinstatement Agreement because, he claimed that that Agreement had expired on July 28th (i.e., one year after its execution date 7/28/97). Raley argued to DCC management that "active on roll" had no meaning whatsoever. However, after consulting with Robert Hoetger and Toni Miri, the UAW benefits representative, Raley confirmed that when an employee is on salary continuation, he is placed on *inactive* on roll status. [See Defendant's Ex. 11, UAW Local 412 file of Tom Cotter Discharge, notes of Darin Raley, p. 5.] Therefore, the union determined that management was correct in its construction of Cotter's Conditional Reinstatement Agreement, i.e., that the term of the Agreement was extended by the 46 days he had been on salary continuation, and therefore, his August 18, 1998 absence was covered under the terms of the Agreement, and that absence being Plaintiff's seventh excused or casual absence called for his dismissal. Upon confirming the accuracy of the reason for Cotter's discharge, the UAW withdrew his grievance on October 28, 1998. [See Defendant's Ex. 12.]

Plaintiff testified that after he received the letter from Dennis Turner of the In-

---

1. "Salary continuation" is a term used by DCC for more than casual absences (i.e., more than 2 or three days).

2. Plaintiff denies this having been specifically communicated to him at the meeting.

ternational UAW informing him of the decision to withdraw his grievance, he called Turner to voice his displeasure with that decision. Despite the fact that the CBA grievance procedures provide for additional steps including review by an Appeal Board and Arbitration [see Defendant's Ex. 2] Plaintiff admitted in his deposition, that he never asked Dennis Turner to take his grievance to the next level.

Plaintiff testified that several weeks after talking to Turner, *"someone hinted* to the fact that there was something [more] available, more available to me out there, that I may not [yet] have utilized." [Plaintiff's Dep. p. 106.] Based upon that "hint," Plaintiff obtained from the Union a copy of Article 33 of the UAW Constitution which is the intra-union appeal procedure. [See Defendant's Ex. 14.] Article 33 provides for review by the Convention Appeals Committee or the Public Review Board, at the option of the employee. Plaintiff admits, however, that he never pursued an appeal through these intra-union avenues because someone also "hinted" that the time for such an appeal may have expired and because "no one ever offered to help me, in spite of me *not* asking directly, ... 'should I do this appeal.' " [Plaintiff's Dep. p. 107.]

Instead, on March 8, 1999, Plaintiff initiated this lawsuit against Daimler Chrysler in Wayne County Circuit Court. In his Complaint, Plaintiff alleged three counts— breach of contract (Count I); promissory estoppel based on representations allegedly made "during the course of negotiations" between DCC and the UAW (Count II), and the misrepresentation that Plaintiff "would be reinstated with full seniority ... and governed by the existing contract between the union and the defendant" (Count III).[3] Defendant DCC subsequently removed the case to this Court under Section 301 of the Labor Management Relations Act (the "L.M.R.A.")

At the scheduling conference conducted by the Court on May 7, 1999, the Court raised the issue that the Plaintiff's Union had not been joined as a party and that Plaintiff would have to charge his Union with breach of its duty of fair representation in order to proceed with his claims against DCC. Accordingly, the Court directed Plaintiff to file an amended complaint to cure these apparent deficiencies.

Plaintiff did timely file an Amended Complaint but still did not join the UAW as a party-defendant. The only changes made by Plaintiff in his Complaint was the addition of two paragraphs in which he stated

17. That the plaintiff's union, through it's [sic] International Headquarters, refused to pursue plaintiff's claim for reinstatement.

18. That your plaintiff did exhaust his administrative remedies.

[Amended Complaint, ¶¶ 17, 18.]

Discovery has now closed and the parties now each move for entry of summary judgment in their favor.

Defendant DaimlerChrysler argues that it is entitled to summary judgment in its favor because Plaintiff's claims are preempted under the LMRA and Plaintiff has not satisfied the LMRA prerequisites for bringing an action against his employer, namely that he either exhausted his contractual remedies or that he was excused from exhausting those remedies by his union's breach of its duty to fairly represent him. Plaintiff counters that he did exhaust his contractual remedies and bases this contention on his belief that he had taken his grievance as far as he could. Therefore, he contends that the Court should proceed to the merits of his com-

---

**3.** Although pled as state common law wrongful discharge action, Plaintiff specifically alleged in his Complaint that the contract upon which he relies as the basis for his claims is "the agreement between Chrysler Corp. and the Engineering Office and Clerical Workers," Complaint ¶ 14, in other words, "the contract between the union and defendant." Complaint ¶ 30. It is pursuant to this collective bargaining agreement that Plaintiff claims he "could not be terminated without just cause." Complaint ¶¶ 15, 23, 31.

plaint. In this regard, Plaintiff argues that the term "active on roll" is ambiguous and, since under Michigan law a contract should be construed against the party drafting it, Plaintiff maintains that he is entitled to summary judgment in his favor.

## A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[4] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding the motions for summary judgment in this case.

## B. PLAINTIFF'S CLAIMS ARE PREEMPTED UNDER SECTION 301 OF THE LMRA

█ It is well-settled that where the resolution of a state-law claim is inextrica-

---

**4.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

bly intertwined with the provisions of a collective bargaining agreement such that interpretation of the terms of the agreement is required, the state-law claim is preempted under the LMRA. *See, Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 1915, 85 L.Ed.2d 206 (1985); *Lingle v. Norge Division of Magic Chef,* 486 U.S. 399, 405, 108 S.Ct. 1877 1881, 100 L.Ed.2d 410 (1988). *See also, Terwilliger v. Greyhound Lines, Inc.,* 882 F.2d 1033, 1037–8 (6th Cir.1989), *cert. denied,* 495 U.S. 946, 110 S.Ct. 2204, 109 L.Ed.2d 531 (1990) (Section 301 preempts claims whose resolution requires interpretation of the terms of a collective bargaining agreement or claims based on rights created by the collective bargaining agreement.)

Here, Plaintiff Cotter claims that DaimlerChrysler wrongfully discharged him without just cause in violation of his contract. Resolution of this claim requires interpretation of the terms of the CBA as well as of the Conditional Reinstatement Agreement entered into by Plaintiff, his union and DCC pursuant thereto. Furthermore, the rights which Plaintiff seeks to vindicate arise solely under the terms of the collective bargaining agreement. As was the case with the plaintiff in Terwilliger and his employer, Greyhound, the CBA in this case provides the only basis for the relationship between Plaintiff Cotter and DaimlerChrysler. Plaintiff here seeks reinstatement to his position with full seniority plus lost wages. "Section 301 governs claims founded directly on rights created by collective bargaining agreements." *Terwilliger, supra,* quoting *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 107 S.Ct. 2425, 2431, 96 L.Ed.2d 318 (1987).

Thus, as the Sixth Circuit found in *Terwilliger,* "preemption here is more essential as a matter of public policy since both triggers of section 301 preemption are present: resolution of the state-law claim[s] directly require[ ] construction of the terms of the collective bargaining agreement, and the rights sought to be vindicated and the relationship between the parties are created, not by state law, but by the collective bargaining agreement itself." 882 F.2d at 1038.

## C. *PLAINTIFF FAILED TO EXHAUST HIS GRIEVANCE AND INTRA–UNION REMEDIES*

Since Plaintiff's claims are preempted by Section 301, they should have been first resolved through the CBA grievance and intra-union appeal procedures available to him. *See Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965); *Clayton v. Automobile Workers,* 451 U.S. 679, 681, 101 S.Ct. 2088, 2091, 68 L.Ed.2d 538 (1981). It is undisputed, however, that Plaintiff did not exhaust the remedies available to him either under the collective bargaining agreement or through the Union Constitution.

Plaintiff appears to argue that he is excused from exhausting all of the available CBA and intra-union remedies available to him because to proceed any further would have been futile.[5]

The Sixth Circuit requires "a clear and positive showing of futility before excusing a failure to exhaust...." *Miller v. Chrysler Corporation,* 748 F.2d 323, 326 (6th Cir.1984). Plaintiff has made no such showing. That he subjectively may have thought such procedures were futile is insufficient. *Terwilliger, supra.* Plaintiff's futility claim is similar to that made in *Miller, supra,* where the employees failed to initiate grievance procedures with the union because the union agreed with the company that they were properly trans-

---

**5.** Although Plaintiff conclusorily states that he has exhausted his remedies, in effect, what he really is claiming is that because he contends his union representatives told him when they informed him that they were withdrawing his grievance without prejudice they could do no more for him, it would have been futile for him to attempt to proceed any further. He admits that he did not request that his local take his grievance to arbitration and he further admits that he did not pursue his intra-union appeal remedies.

ferred out of their unit and, therefore, they believed that the union would not have pursued their claim. Such a subjective belief was insufficient to excuse them from at least attempting to utilize the procedures.

█ Here, Plaintiff admits that he did not attempt to pursue his available remedies under the collective bargaining agreement or under the Union Constitution because his representative told him there was nothing more he could do for him. However, Plaintiff admitted in his deposition that he *knew* there was an arbitration procedure and an intra-Union appeal mechanism available to him but, in his opinion, he had already gone "all the way through" with his available extra-judicial remedies. Plaintiff's testimony regarding exhaustion of his union remedies is as follows:

Q: The October 28th letter that you noted you received October 31st [Defendant's Ex. 12] indicates that the union withdrew the grievance without prejudice, because they believed they could do nothing further for you.

Did you have a conversation with Mr. Turner prior to the date of this letter?

A: Prior to, no. After, afterwards I did, yes.

\* \* \* \* \* \*

Q: Okay. And you contacted him?

A: Correct.

Q: By telephone or face-to-face meeting?

A: By telephone.

\* \* \* \* \* \*

Q: It was within a few days after receipt of the letter you did have direct contact?

A: Within a week, yeah. I would say so.

Q: And what do you recall discussing with him during that telephone conversation?

A: Just what—[I] asked him what exactly happened, was there a second

step meeting, and why is this the outcome. And he still at that point basically just gave me a brief description of what happened at this meeting and that he felt—basically just what the letter says, that there is really no further action can be done.

Q: And did you indicate to him at that time that you were dissatisfied with the result?

A: Yes, I did.

Q: Did you do anything further than just indicate your dissatisfaction?

A: I indicated my dissatisfaction and I said I guess at this point I would have to take this legally outside. And he said okay.

Q: Did you ask him if there were any further appeals available for you within the union?

A: He had indicated to me both in this letter, *the way I see it,* and verbally, that that wasn't the case. He says in his last paragraph of this letter therefore, there is no way any further relief can be gained. *To me, that was pretty much stating there was no ... representation.*

\* \* \* \* \* \*

Q: *Did you ask him about an arbitration procedure?*

A: No.... *I knew there was,* that you had to take this through the union before you go legally. That's all I knew. *And to me, this was all the way through.* They gave up....

\* \* \* \* \* \*

Q: The last three pages of [Deposition] Exhibit 6 start[s] with Article 33. [See Defendant's Ex. 14.] What is that from?

A: That is from the union institution [sic; constitution].

\* \* \* \* \* \*

Q: How did you obtain that?

A: Through the union, when I did finally call back. Because *I was notified*—I was calling to find out something to do with the case, with Mr. Linden [Plaintiff's counsel], and it—*someone hinted to the fact that there was something available, more available to me out there, that I may not have utilized.*

Q: *And it indicates that you may appeal the decision to withdraw the grievance. Did you appeal pursuant to Article 33?*

A: *No, I did not.*

[Plaintiff's Dep. pp. 102–106 (emphasis added).]

The foregoing makes clear, that Plaintiff knew that there were remedies available to him to appeal the union's decision to withdraw his grievance. Plaintiff's subjective belief that it would have been futile to pursue intra-union remedies available to him is not sufficient to excuse his failure to exhaust such remedies. As indicated, this Circuit requires a "clear and positive showing" that pursuit of grievance and intra-union appeal procedures would be futile before allowing access to federal courts on Section 301 claims. *See Miller v. Chrysler Corp., supra; Terwilliger v. Greyhound Lines, supra.* Similarly, in *Wilson v. International Brotherhood of Teamsters,* 83 F.3d 747, 753 (6th Cir.1996), cert. denied, 519 U.S. 1041, 117 S.Ct. 610, 136 L.Ed.2d 535 (1996), the Court of Appeals found that a union representative's "perfunctory response" to a grievant's complaint about the "less than vigorous" handling of his grievance was insufficient to excuse the plaintiff from failing to pursue his contractual remedies so as to entitle him to proceed with his Section 301 breach of contract action. At best, the only evidence that Plaintiff here has proffered to excuse his failure to pursue his contractual and intra-union remedies is the "perfunctory" response of Dennis Turner that his union representatives had concluded that his discharge was proper and,

therefore, he "could do nothing further for him."

Furthermore, the record evidence of this matter establishes that Plaintiff's subjective belief that it would have been "too late" to pursue the matter through the grievance procedure after he received Turner's October 28, 1998 letter on October 31st is not well-founded. The CBA grievance procedures specifically provide that when a grievance is withdrawn "without prejudice," as was the case with Mr. Cotter's grievance, it may be reinstated within three months of withdrawal. [See Defendant's Ex. 2, CBA § 25(b), p. 26.] Therefore, Cotter had at least until the end of January, 1999 to attempt to have his grievance reinstated, but he did not do so. Instead, he instituted this action.

Moreover, the International Union Constitution specifically provides that

It shall be the duty of any individual . . . if aggrieved by any action, decision or penalty imposed, to exhaust fully the individual's . . . remedy and all appeals under this Constitution and the rules of this Union before going to a civil court or governmental agency for redress.

[Plaintiff's Ex. B, p. 98.]

In addition to the grievance procedures provided in the CBA, the Union Constitution provides an intra-union appeal procedure which was available to Plaintiff to appeal the handling of his grievance to the International Executive Board and then to the Public Review Board. [See Article 33 of the Union Constitution, Plaintiff's Ex. B; Defendant's Ex. 14.] Plaintiff admits that he did not file an intra-union appeal pursuant to Article 33. [See Plaintiff's Dep. p. 106. Q: "Did you appeal pursuant to Article 33?" A: "No, I did not."]

In *Clayton v. International Union,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981), the Supreme Court declined to impose a universal requirement of exhaustion of internal union remedies. Rather, the Court held that whether to require exhaustion of intra-union remedies is a

matter of discretion for trial courts to decide. 451 U.S. at 698, 101 S.Ct. at 2095. In exercising this discretion, the *Clayton* Court instructed lower courts to consider three factors:

> [F]irst, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim.

*Id.* If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust. *Id.*

■ Turning then to the record in this case, there is nothing of record to establish that any of the *Clayton* factors exist here. First, there is no evidence of any hostility on the part of Plaintiff's union officials towards him, nor has Plaintiff alleged nor proven that the UAW internal appeals procedures are not fair and reasonable. Therefore, the first *Clayton* factor is not satisfied. Second, a review of the contract and internal union procedures demonstrates that reactivation of Plaintiff's grievance was a remedy available to Plaintiff if he were to succeed in an intra-union appeal. [See Plaintiff's Ex. B. See also, Defendant's Ex. 2, Section 25(b) (grievance withdrawn without prejudice may be reinstated within three months).] Therefore, inadequacy of remedies is not an issue.

Finally, there is nothing of record to suggest that exhaustion of internal procedures would unreasonably delay Plaintiff's opportunity to obtain a judicial hearing on the merits of his claim. The appeal procedures provided in the UAW Constitution contemplate a timely progression through each step of the appeal such that an appeal can proceed through the International Executive Board and, if not resolved to the employee's satisfaction at that level, to the Public Review Board all within 90 to 120 days. [See Plaintiff's Ex. B, pp. 92–97.] As such, exhaustion by Plaintiff of the internal UAW appeal procedures would not unreasonably delay Plaintiff's opportunity to obtain judicial relief thereafter. *See Clayton v. International Union, supra,* "Intraunion procedures which take years to complete serve no worthwhile purpose in the overall scheme of promoting the prompt and private resolution of claims." But a requirement that an employee not be permitted to go to court without first having pursued an intraunion appeal for at least four procedures would not unreasonably delay Plaintiff's opportunity to obtain judicial relief thereafter. *See Clayton v. International Union, supra,* "Intraunion procedures which take years to complete serve no worthwhile purpose in the overall scheme of promoting the prompt and private resolution of claims. But a requirement that an employee not be permitted to go to court without first having pursued an intraunion appeal for at least four months does substantially further this national labor policy without placing any unfair burden on an employee." 101 S.Ct. at 2102 (Renquist, J. dissenting).

Because none of the *Clayton* factors are satisfied, there is no basis for this Court to excuse Plaintiff's failure to exhaust his intra-union remedies. *See Wagner v. General Dynamics,* 905 F.2d 126 (6th Cir.1990). Plaintiff's unexcused failure to exhaust his intraunion remedies, like his unexcused failure to exhaust his contractual remedies, mandates dismissal of this action. *Clayton v. International Union, supra,* 451 U.S. at 696, 101 S.Ct. at 2099; *Wagner v. General Dynamics, supra; Monroe v. International Union, UAW,* 723 F.2d 22, 24 (6th Cir.1983).

D. *PLAINTIFF HAS NOT ESTABLISHED THAT HIS UNION BREACHED ITS DUTY OF FAIR REPRESENTATION*

■ Even if the Court were to find that Plaintiff's failure to exhaust his contractual

and intra-union remedies was excused, dismissal of this action would still be required. It is well-settled that for a union employee to maintain an action for breach of a labor contract against his employer, he must also establish that his union breached its duty of fair representation. *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Such a suit, as a formal matter, comprises two causes of action. The suit against the employer rests on § 301, since the employee is alleging a breach of the collective bargaining agreement. The suit against the union is one for breach of the union's duty of fair representation. *Vaca v. Sipes, supra; DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). The two claims are inextricably interdependent: To prevail against either the company or the Union, the employee-plaintiff must not only show that his discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union. *Id.*, 103 S.Ct. at 2290–91. The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both. *Id.* at 2291.

■ To meet his burden of proof as to the union's breach of its duty of fair representation, a plaintiff must establish by substantial evidence that the union acted arbitrarily, discriminatorily or with bad faith. *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 299, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); *Ratkosky v. United Transportation Union*, 843 F.2d 869 (6th Cir.1988) (summary judgment granted where plaintiff fails to make a showing of bad faith,

discrimination or arbitrary conduct on the part of the union). If the employee cannot carry this burden, the claim against the employer for breach of contract must be dismissed. *Republic Steel Corp. v. Maddox, supra.*

■ Turning to the facts of this case, Plaintiff's only allegation against the UAW is that the union refused to pursue his grievance beyond step 2½.[6] (The next step, Step 3, is the Appeal Board (i.e., arbitration) step.) However, it is well-settled that no individual employee has an absolute right to have his or her grievance arbitrated. *International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979); *Vaca v. Sipes, supra*, 386 U.S. at 191, 87 S.Ct. at 917; *Poole v. Budd Co.*, 706 F.2d 181 (6th Cir.1983). This is because union officials have a wide range of reasonableness in dealing with discretionary decisions under the grievance process. *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953); *Ratkosky, supra*, 843 F.2d at 876. . Unions are given considerable discretion in sifting out grievances and although what constitutes arbitrary treatment depends upon the facts of each particular case, it suffices if a union decides in good faith on the basis of objective, rational criteria that the grievance lacks sufficient merit to justify the expense of arbitration. *Poole*, 706 F.2d at 183; *Sargent v. International Brotherhood of Teamsters*, 713 F.Supp. 999, 1010 (E.D.Mich.1989) Furthermore, even if it is determined that an employee's grievance is meritorious, the union may, nonetheless, without breaching its duty of

6. Step 2½ of the Grievance procedure is delineated in section 22(b) of the CBA. It is the step immediately preceding the Appeal Board (i.e., arbitration) step and provides in pertinent part as follows:

After a grievance which involves a matter that is one on which the Appeal Board has power and authority to rule has been answered at the Second Step, if the Regional Director, or his representative, did not attend the Second Step meeting, the National Chrysler Department of the International

Union may arrange with Corporate Union Relations for a meeting to be held with the Regional Director, or his representative, the Unit Chairman or President and the Labor Relations Supervisor. The purpose of this meeting shall be to discuss the facts involved in the grievance so that the Regional Director, or his representative, can decide whether or not to recommend appealing the grievance.

[See Defendant's Ex. 2, p. 23.]

fair representation, decide not to submit the grievance to arbitration so long as that decision is based on rational and objective grounds. *Id.* And, in evaluating these decisions, courts must be careful not to substitute their post-hoc judgment for that of the authorized labor organization. *Ratkosky, supra,* 843 F.2d at 876.

■ In this case, the record evidence establishes that the union's decision not to take Plaintiff's grievance to the Appeal Board was not made arbitrarily based but rather was based upon rational and objective grounds. The union's file of Mr. Cotter's discharge [Defendant's Ex. 11] demonstrates that the union thoroughly investigated the matter, and it was only after it had completed that investigation and consulted with the union's benefits specialist that it concluded that DCC's extension of the time that Mr. Cotter was subject to the terms of the Conditional Reinstatement Agreement by virtue of the "active on roll" provision was correct. Even in light of that conclusion, the union "strongly protested" Cotter's discharge. [See letter from Dennis Turner, the representative of the UAW Region 1 Regional Director, Defendant's Ex. 12.] Furthermore, there is no evidence, whatsoever, that the union's decision was made discriminatorily or in bad faith.

In sum, Plaintiff has failed to prove that his union breached its duty of fair representation, and that failure to prove a claim of breach of duty of fair representation, is fatal to Plaintiff's breach of contract claim against Daimler Chrysler.

**E. *PLAINTIFF CANNOT ESTABLISH A BREACH OF CONTRACT***

■ Even assuming *arguendo* that Plaintiff had established that his union breached its duty of fair representation, Defendant would nonetheless be entitled to summary judgment because Plaintiff has not established that DCC breached his employment contract.

The Conditional Reinstatement Agreement must be treated in the same manner

as the collective bargaining agreement since it is a negotiated agreement that supplements the CBA. *See e.g., Bakers Union Factory No. 326 v. ITT Continental Baking Co., Inc.,* 749 F.2d 350, 354 (6th Cir.1984) ("last chance" agreements constitute formal contractual settlements of labor disputes and they should be construed as part of a CBA); *International Union of Operating Engineers Local 351 v. Cooper Natural Resources, Inc.,* 163 F.3d 916, 919 (5th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 45, 145 L.Ed.2d 40 (1999) (last chance agreement "formed a binding contract pursuant to the CBA which was entitled to enforcement by the arbitrator.... The LCA must be thought of as a supplement to the CBA and is just as binding upon the arbitrator.") *See also, Tootsie Roll Indus., Inc. v. Local Union No. 1,* 832 F.2d 81, 84 (7th Cir.1987); *Coca-Cola Bottling Co. v. Teamsters Local Union No. 688,* 959 F.2d 1438, 1440 (6th Cir.1992), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992).

Contract construction is a question of law for the Court to decide. *Industrial Equipment Co. v. Emerson Elec. Co.,* 554 F.2d 276, 284 (6th Cir.1977). It is a time-honored principle of contract construction that contracts should be interpreted so as to give meaning to each and every word. *See* 17A Am.Jur.2d contracts at 387 (1991) (no word in a contract should be rejected as mere surplusage if the court can determine any reasonable purpose for that word). *See also, Intel Corp. v. International Trade Comm'n,* 946 F.2d 821, 826 (Fed.Cir.1991) ("When interpreting a contract, we must, were possible give meaning and purpose to every term used in the contract"); *Financial Services, Inc. v. Ryan,* 928 F.2d 994, 999–1000 (11th Cir. 1991) ("[A]n interpretation that gives reasonable meaning to all parts of the contract would be preferred to one that leaves portions of the contract meaningless"); *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985) (it is a "well accepted and basic principle that an interpretation that gives reasonable meaning to

all parts of the contract would be preferred to one that leaves portions of the contract meaningless").

Applying these rules of contract construction to the Conditional Reinstatement Agreement at issue here, it is clear that Plaintiff's contention that the phrase "active on roll" had no meaning whatsoever is without merit. Had the parties not intended the phrase to have any meaning, they would have simply stated that the term of the agreement was 12 months. Clearly, "active on roll" was intended to modify the 12–month term of the agreement. Since Plaintiff was *off* the active roll for the 46 days that he was on salary continuation, the Conditional Reinstatement Agreement remained in effect until September 12, 1998. When Plaintiff incurred his seventh casual absence in violation of ¶ 4A of the Agreement on August 18, 1998, he was appropriately discharged.

## CONCLUSION

For all of the reasons set forth in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be, and hereby is, GRANTED and Plaintiff's Motion for Summary Judgment is DENIED. Accordingly,

IT IS FURTHER ORDERED that Plaintiff's case be, and hereby is, DISMISSED in its entirety, with prejudice.